# UNITED STATES *v.* SOUTH-EASTERN UNDER-WRITERS ASSOCIATION ET AL.

No. 354.   Argued January 11, 1944.—Decided June 5, 1944.

*Attorney General Biddle,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Robert L. Stern, Frank H. Elmore, Jr.,* and *Manuel M. Gorman* were on the brief, for the United States.

*Messrs. John T. Cahill* and *Dan MacDougald,* with whom *Messrs. Thurlow M. Gordon, Neil C. Head, Jerrold G. Van Cise,* and *Howard C. Wood* were on the brief, for appellees.

Briefs were filed (1) on behalf of the States of Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Ne-

braska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Utah, Vermont, Washington, Wisconsin and West Virginia, and (2) on behalf of the State of Virginia, as *amici curiae*, urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

For seventy-five years this Court has held, whenever the question has been presented, that the Commerce Clause of the Constitution does not deprive the individual states of power to regulate and tax specific activities of foreign insurance companies which sell policies within their territories. Each state has been held to have this power even though negotiation and execution of the companies' policy contracts involved communications of information and movements of persons, moneys, and papers across state lines. Not one of all these cases, however, has involved an Act of Congress which required the Court to decide the issue of whether the Commerce Clause grants to Congress the power to regulate insurance transactions stretching across state lines. Today for the first time in the history of the Court that issue is squarely presented and must be decided.

Appellees—the South-Eastern Underwriters Association (S. E. U. A.), and its membership of nearly 200 private stock fire insurance companies, and 27 individuals—were indicted in the District Court for alleged violations of the Sherman Anti-Trust Act. The indictment alleges two conspiracies. The first, in violation of § 1 of the Act, was to restrain interstate trade and commerce by fixing and maintaining arbitrary and non-competitive premium rates on fire and specified "allied lines" [1] of insurance in

---

[1] The "allied lines" of insurance handled by appellees are described in the indictment as "inland navigation and transportation, inland marine, sprinkler leakage, explosion, windstorm and tornado, extended coverage, use and occupancy, and riot and civil commotion insurance."

Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia; the second, in violation of § 2, was to monopolize trade and commerce in the same lines of insurance in and among the same states.[2]

The indictment makes the following charges: The member companies of S. E. U. A. controlled 90 per cent of the fire insurance and "allied lines" sold by stock fire insurance companies in the six states where the conspiracies were consummated.[3] Both conspiracies consisted of a continuing agreement and concert of action effectuated through S. E. U. A. The conspirators not only fixed premium rates and agents' commissions, but employed boycotts together with other types of coercion and intimidation to force nonmember insurance companies into the conspiracies, and to compel persons who needed insurance to buy only from S. E. U. A. members on S. E. U. A. terms. Companies not members of S. E. U. A. were cut off from the opportunity to reinsure their risks, and their services and facilities were disparaged; independent sales agencies who defiantly rep-

---

[2] The pertinent provisions of §§ 1 and 2 of the Act of July 2, 1890, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2, commonly known as the Sherman Act, are as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor. . . .

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, . . ."

[3] The indictment does not state the proportion of fire insurance and "allied lines" sold by stock companies, as distinguished from mutuals, etc., in the six states involved. But it does state that "stock companies receive approximately 85% of the total premium income of all fire insurance companies operating in the United States."

resented non-S. E. U. A. companies were punished by a withdrawal of the right to represent the members of S. E. U. A.; and persons needing insurance who purchased from non-S. E. U. A. companies were threatened with boycotts and withdrawal of all patronage. The two conspiracies were effectively policed by inspection and rating bureaus in five of the six states, together with local boards of insurance agents in certain cities of all six states.

The kind of interference with the free play of competitive forces with which the appellees are charged is exactly the type of conduct which the Sherman Act has outlawed for American "trade or commerce" among the states.[4] Appellees [5] have not argued otherwise. Their defense, set forth in a demurrer, has been that they are not required to conform to the standards of business conduct established by the Sherman Act because "the business of fire insurance is not commerce." Sustaining the demurrer, the District Court held that "the business of insurance is not commerce, either intrastate or interstate"; it "is not interstate commerce or interstate trade, though it might be considered a trade subject to local laws, either State or Federal, where the commerce clause is not the authority relied upon." 51 F. Supp. 712, 713, 714.

The District Court's opinion does not contain the slightest intimation that the indictment was held defective on a theory that it charged the appellees with restraining and monopolizing nothing but the making of local contracts.

---

[4] See, e. g., *Fashion Guild* v. *Trade Comm'n*, 312 U. S. 457, 465–468; *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 210–224; *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 394; *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 395–402; *United States* v. *Patten*, 226 U. S. 525; *Swift & Co.* v. *United States*, 196 U. S. 375.

[5] The appellees include all of the individuals and companies named as defendants in the indictment except the Universal Insurance Company and the Kansas City Fire and Marine Insurance Company, neither of which joined in the demurrer to the indictment.

There was not even a demurrer on that ground. The District Court treated the indictment as charging illegal restraints of trade in the total "activities complained of as constituting the business of insurance." 51 F. Supp. 712, 713. And in great detail the indictment set out these total activities, of which the actual making of contracts was but a part. As recognized by the District Court, the insurance business described in the indictment included not only the execution of insurance contracts but also negotiations and events prior to execution of the contracts and the innumerable transactions necessary to performance of the contracts. All of these alleged transactions, we shall hereafter point out, constituted a single continuous chain of events, many of which were multistate in character, and none of which, if we accept the allegations of the indictment, could possibly have been continued but for that part of them which moved back and forth across state lines. True, many of the activities described in the indictment which constituted this chain of events might, if conceptually separated from that from which they are inseparable, be regarded as wholly local. But the District Court in construing the indictment did not attempt such a metaphysical separation. Looking at all the transactions charged, it felt compelled by previous decisions of this Court to hold that despite the interstate character of many of them "the business of insurance is not commerce," and that as a consequence this "business," contracts and all, could not be "interstate commerce" or "interstate trade." In other words, the District Court held the indictment bad for the sole reason that the entire "business of insurance" (not merely the part of the business in which contracts are physically executed) can never under any possible circumstances be "commerce," and that therefore, even though an insurance company conducts a substantial part of its business transactions across state lines, it is not engaged in "commerce among the States" within the meaning of

either the Commerce Clause or the Sherman Anti-Trust Act.[6]  Therefore to say that the indictment charges nothing more than restraint and monopoly in the "mere formation of an insurance contract," as has been suggested in this Court, is to give it a different and narrower meaning than did the District Court,—something we cannot do consistently with the Criminal Appeals Act which permits the case to come here on direct appeal.[7]

The record, then, presents two questions and no others: (1) Was the Sherman Act intended to prohibit conduct of fire insurance companies which restrains or monopolizes the interstate fire insurance trade?  (2) If so, do fire insurance transactions which stretch across state lines constitute "Commerce among the several States" so as to make them subject to regulation by Congress under the

---

[6] Although the District Court also sustained two additional grounds of demurrer (that the indictment did not state facts sufficient to constitute a federal offense, and that the court lacked jurisdiction of the subject matter), the opinion makes clear it did so because of the conclusion that "the business of insurance is not commerce." Two further grounds of demurrer, based upon the Fifth, Sixth, and Tenth Amendments, were not considered by the District Court.

[7] See 56 Stat. 271 amending 34 Stat. 1246; 18 U. S. C. 682; *United States* v. *Borden Co.*, 308 U. S. 188, 192–193. Appellees contend that the District Court read both counts of the indictment as alleging that the trade or commerce sought to be restrained and monopolized was the business of selling fire insurance, that the Court rightly decided that such business was not commerce, and that therefore its judgment should be affirmed. The Government denies that the Court construed the indictment so narrowly. It insists that the first count of the indictment charges a violation of § 1 of the Act regardless of whether the insurance business itself be commerce, since that count charges that the practices of the fire insurance companies constituted an unlawful restraint of interstate trade or commerce in such fields as transportation and industry which must purchase fire insurance. Cf. *Polish Alliance* v. *Labor Board, post,* p. 643. In the view we take of the case it is unnecessary to pass upon this question. We consider the case on the assumption that appellees' contention on this point is correct.

Commerce Clause? Since it is our conclusion that the Sherman Act was intended to apply to the fire insurance business we shall, for convenience of discussion, first consider the latter question.

## I.

Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written. To hold that the word "commerce" as used in the Commerce Clause does not include a business such as insurance would do just that. Whatever other meanings "commerce" may have included in 1787, the dictionaries, encyclopedias, and other books of the period show that it included trade: business in which persons bought and sold, bargained and contracted.[8] And this meaning has persisted to modern times. Surely, therefore, a heavy burden is on him who asserts that the plenary power which the Commerce Clause grants to Congress to regulate "Commerce among the several States" does not include the power to regulate trading in insurance to the same extent that it includes power to regulate other trades or businesses conducted across state lines.[9]

The modern insurance business holds a commanding position in the trade and commerce of our Nation. Built

---

[8] See *Gibbons* v. *Ogden,* 9 Wheat. 1; also, Hamilton and Adair, The Power to Govern (N. Y. 1937), pp. 53–63.

[9] Alexander Hamilton, in 1791, stating his opinion on the constitutionality of the Bank of the United States, declared that it would "admit of little if any question" that the federal power to regulate foreign commerce included "the regulation of policies of insurance." 3 Works of Alexander Hamilton (Fed. Ed., N. Y. 1904) pp. 445, 469–470. Speaking of the need of a federal power to regulate "commerce," Hamilton had earlier said, "It is, indeed, evident, on the most superficial view, that there is no object, either as it respects the interests of trade or finance, that more strongly demands a federal superintendence." Federalist No. XXII, The Federalist (Rev. Ed., N. Y. 1901) 110.

upon the sale of contracts of indemnity, it has become one of the largest and most important branches of commerce.[10] Its total assets exceed $37,000,000,000, or the approximate equivalent of the value of all farm lands and buildings in the United States.[11] Its annual premium receipts exceed $6,000,000,000, more than the average annual revenue receipts of the United States Government during the last decade.[12] Included in the labor force of insurance are 524,000 experienced workers, almost as many as seek their livings in coal mining or automobile manufacturing.[13] Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business. Insurance touches the home, the family, and the occupation or the business of almost every person in the United States.[14]

---

[10] According to figures gathered by the National Resources Committee, each of the three largest legal reserve life insurance companies in 1935 had assets greater than any one of the three largest industrial corporations, viz., the Standard Oil Company of New Jersey, the United States Steel Corporation, or the General Motors Corporation. Report to the President by the National Resources Committee, June 9, 1939: The Structure of the American Economy, Part I, pp. 100, 101 (U. S. Government Printing Office).

[11] U. S. Department of Commerce, Statistical Abstract of the United States, 1942, pp. 335–342, 694.

[12] *Ibid.*, pp. 195, 335–342.

[13] Sixteenth Census of the United States—1940; Part 1: United States Summary, Vol. III, The Labor Force, pp. 180, 181.

[14] "We have shown that the business of insurance has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. . . . Insurance . . . is practically a necessity to business activity and enterprise. It is, therefore, essentially different from ordinary commercial transactions, and, as we have seen, according to the sense of the world from the earliest times—certainly the sense of the modern world—is of the greatest public concern." *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, 414–415.

This business is not separated into 48 distinct territorial compartments which function in isolation from each other. Interrelationship, interdependence, and integration of activities in all the states in which they operate are practical aspects of the insurance companies' methods of doing business. A large share of the insurance business is concentrated in a comparatively few companies located, for the most part, in the financial centers of the East.[15] Premiums collected from policyholders in every part of the United States flow into these companies for investment. As policies become payable, checks and drafts flow back to the many states where the policyholders reside. The result is a continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts. Individual policyholders living in many different states who own policies in a single company have their separate interests blended in one assembled fund of assets upon which all are equally dependent for payment of their policies. The decisions which that company makes at its home office—the risks it insures, the premiums it charges, the investments it makes, the losses it pays—concern not just the people of the state where the home office happens

---

[15] The five largest legal reserve life insurance companies, owning total assets of approximately $15,000,000,000, have their home offices in or near New York City. Best's Life Reports, 1939, as summarized in Monograph 28 printed for the use of the Temporary National Economic Committee, Appendix A (U. S. Government Printing Office, 1940). Each of these companies is licensed in every state of the Union except that two of them are not licensed in Texas. Life Insurance Year Book, 1942–3.

The five largest stock fire and marine insurance companies, owning total assets of approximately $550,000,000, are similarly located. Best's 1943 Digest of Insurance Stocks, xxxii. And each does business in every state of the Union. *Ibid.*

.to be located. They concern people living far beyond the boundaries of that state.

That the fire insurance transactions alleged to have been restrained and monopolized by appellees fit the above described pattern of the national insurance trade is shown by the indictment before us. Of the nearly 200 combining companies, chartered in various states and foreign countries, only 18 maintained their home offices in one of the six states in which the S. E. U. A. operated; and 127 had headquarters in either New York, Pennsylvania, or Connecticut. During the period 1931–1941 a total of $488,000,000 in premiums was collected by local agents in the six states, most of which was transmitted to home offices in other states; while during the same period $215,000,000 in losses was paid by checks or drafts sent from the home offices to the companies' local agents for delivery to the policyholders.[16] Local agents solicited prospects, utilized policy forms sent from home offices, and made regular reports to their companies by mail, telephone or telegraph. Special travelling agents supervised local operations. The insurance sold by members of S. E. U. A. covered not only all kinds of fixed local properties, but also such properties as steamboats, tugs, ferries, shipyards, warehouses, terminals, trucks, busses, railroad equipment and rolling stock, and movable goods of all types carried in interstate and foreign commerce by every media of transportation.

Despite all of this, despite the fact that most persons, speaking from common knowledge, would instantly say that of course such a business is engaged in trade and

---

[16] The amounts given as premiums collected and losses paid during the period 1931–1941 are for all stock fire insurance companies operating in the six states involved. The companies which were parties to the alleged conspiracies probably collected and paid about 90% of these amounts since they controlled that percentage of the total business.

commerce, the District Court felt compelled by decisions of this Court to conclude that the insurance business can never be trade or commerce within the meaning of the Commerce Clause. We must therefore consider these decisions.

In 1869 this Court held, in sustaining a statute of Virginia which regulated foreign insurance companies, that the statute did not offend the Commerce Clause because "issuing a policy of insurance is not a transaction of commerce." *Paul* v. *Virginia,* 8 Wall. 168, 183.[17]  Since then, in similar cases, this statement has been repeated, and has been broadened. In *Hooper* v. *California,* 155 U. S. 648, 654, 655, decided in 1895, the *Paul* statement was reaffirmed, and the Court added that, "The business of insurance is not commerce." In 1913 the New York Life Insurance Company, protesting against a Montana tax, challenged these broad statements, strongly urging that its business, at least, was so conducted as to be engaged in interstate commerce. But the Court again approved the *Paul* statement and held against the company, saying that "contracts of insurance are not commerce at all,

---

[17] "The defect of the argument lies in the character of their business. Issuing a policy of insurance is not a transaction of commerce. The policies are simple contracts of indemnity against loss by fire, entered into between the corporations and the assured, for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one State to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature and the transfer of the consideration. Such contracts are not inter-state transactions, though the parties may be domiciled in different States. The policies do not take effect—are not executed contracts—until delivered by the agent in Virginia. They are, then, local transactions, and are governed by the local law." 8 Wall. 168, 183.

neither state nor interstate." *New York Life Ins. Co. v. Deer Lodge County*, 231 U. S. 495, 503–504, 510.[18]

In all cases in which the Court has relied upon the proposition that "the business of insurance is not commerce," its attention was focused on the validity of state statutes—the extent to which the Commerce Clause automatically deprived states of the power to regulate the insurance business. Since Congress had at no time attempted to control the insurance business, invalidation of the state statutes would practically have been equivalent to granting insurance companies engaged in interstate activities a blanket license to operate without legal restraint. As early as 1866 the insurance trade, though still in its infancy,[19] was subject to widespread abuses.[20] To meet the imperative need for correction of these abuses

[18] Other cases which have repeated or relied upon the *Paul* generalization are *Ducat* v. *Chicago*, 10 Wall. 410, 415; *Liverpool Insurance Co.* v. *Massachusetts*, 10 Wall. 566, 573; *Philadelphia Fire Assn.* v. *New York*, 119 U. S. 110, 118; *Noble* v. *Mitchell*, 164 U. S. 367, 370; *New York Life Ins. Co.* v. *Cravens*, 178 U. S. 389, 401; *Nutting* v. *Massachusetts*, 183 U. S. 553; *Northwestern Mutual Life Ins. Co.* v. *Wisconsin*, 247 U. S. 132; *National Union Fire Ins. Co.* v. *Wanberg*, 260 U. S. 71, 75; *Bothwell* v. *Buckbee, Mears Co.*, 275 U. S. 274, 276–277; and *Colgate* v. *Harvey*, 296 U. S. 404, 432. For a collection and analysis of the cases see Gavit, The Commerce Clause of the United States Constitution (Bloomington, Indiana, 1932), pp. 134–139.

[19] For statistics illustrative of the tremendous expansion of the fire and marine insurance business between 1860–1941, see New York Insurance Report for 1942, Vol. II, Table A. In 1860 fire and marine insurance companies reporting to the New York Superintendent of Insurance listed assets of $44,500,000 and premiums written of $13,500,000. In 1941 they listed assets of almost $3,000,000,000, and premiums written of $1,150,000,000. *Ibid.*

[20] See generally Insurance Blue Book (Centennial Issue 1876–77), c. VI, "Fire Insurance, 1860–1869"; Patterson, The Insurance Commissioner in the United States (Camb. 1927), pp. 519–537; Nehemkis, Paul v. Virginia, The Need for Re-examination, 27 Georgetown L. J. 519 (1939).

the various state legislatures, including that of Virginia, passed regulatory legislation.[21]  *Paul* v. *Virginia* upheld one of Virginia's statutes.  To uphold insurance laws of other states, including tax laws, *Paul* v. *Virginia's* generalization and reasoning have been consistently adhered to.

Today, however, we are asked to apply this reasoning, not to uphold another state law, but to strike down an Act of Congress which was intended to regulate certain aspects of the methods by which interstate insurance companies do business; and, in so doing, to narrow the scope of the federal power to regulate the activities of a great business carried on back and forth across state lines.  But past decisions of this Court emphasize that legal formulae devised to uphold state power cannot uncritically be accepted as trustworthy guides to determine Congressional power under the Commerce Clause.[22]  Furthermore, the reasons given in support of the generalization that "the business of insurance is not commerce" and can never be conducted so as to constitute "Commerce among the States" are inconsistent with many decisions of this Court which have upheld federal statutes regulating interstate commerce under the Commerce Clause.[23]

---

[21] *Ibid.*

[22] See, e. g., *Wickard* v. *Filburn,* 317 U. S. 111, 121–122; *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 311; *Stafford* v. *Wallace,* 258 U. S. 495, 525–528; *Bacon* v. *Illinois,* 227 U. S. 504, 516–517; *Swift & Co.* v. *United States,* 196 U. S. 375, 400.

[23] That the decisions of this Court upholding state insurance laws do not necessarily constitute a denial of federal power to regulate insurance has, upon occasion, been recognized both by insurance executives and lawyers.  See, for example, An Address on the Regulation of Insurance By Congress, by John F. Dryden, President, Prudential Insurance Company of America, delivered November 22, 1904, pp. 12–13: "The decision [*Paul* v. *Virginia*], and those that have followed, did not relate to the real point involved in a consideration of the regulation of *the insurance business* as interstate commerce by the Federal government. . . . It is the opinion of qualified authori-

One reason advanced for the rule in the *Paul* case has been that insurance policies "are not commodities to be shipped or forwarded from one State to another." [24] But both before and since *Paul* v. *Virginia* this Court has held that Congress can regulate traffic though it consist of intangibles.[25] Another reason much stressed has been that insurance policies are mere personal contracts subject to the laws of the state where executed. But this reason rests upon a distinction between what has been called "local" and what "interstate," a type of mechanical criterion which this Court has not deemed controlling in the measurement of federal power. Cf. *Wickard* v. *Filburn,* 317 U. S. 111, 119–120; *Parker* v. *Brown,* 317 U. S. 341, 360. We may grant that a contract of insurance, considered as a thing apart from negotiation and execution,

---

ties who have given most careful consideration to this aspect of the subject . . . that under the implied and resulting powers of the Constitution the Supreme Court would not withhold the verdict of constitutionality from an act of Congress declaring interstate insurance to be interstate commerce." See, similarly, Insurance is Commerce, by George F. Seward, President, The Fidelity and Casualty Company of New York (1910) pp. 15–16; S. S. Huebner, Federal Supervision and Regulation of Insurance, Annals, Amer. Acad. of Pol. and Soc. Science, Vol. xxvi, No. 3 (1905) 681–707. But see, e. g., *contra:* Vance, Federal Control of Insurance Corporations, 17 Green Bag (1905) 83, 89; Randolph, Opinion on the Proposal for Federal Supervision of Insurance (N. Y. 1905) pp. 12–20.

The report of the Committee on Insurance Law of the American Bar Association, in 1906, discussing the constitutionality of federal supervision of insurance, stated flatly that *Paul* v. *Virginia* and the cases which follow it "do not bar Congressional action." Reports of American Bar Association, Vol. xxix, Part 1 (1906), pp. 538, 552–567.

[24] See Note 17, *supra.*

[25] See for illustration *Gibbons* v. *Ogden,* 9 Wheat. 1, 189–190, 229–230; *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1; *Lottery Case,* 188 U. S. 321; *Jordan* v. *Tashiro,* 278 U. S. 123, 127–128; *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n,* 303 U. S. 419, 432–433; and *American Medical Assn.* v. *United States,* 317 U. S. 519.

does not itself constitute interstate commerce. Cf. *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539, 557–558. But it does not follow from this that the Court is powerless to examine the entire transaction, of which that contract is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce.[26] Only by treating the Congressional power over commerce among the states as a "technical legal conception" rather than as a "practical one, drawn from the course of business" could such a conclusion be reached. *Swift & Co.* v. *United States*, 196 U. S. 375, 398. In short, a nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature. Were the rule otherwise, few businesses could be said to be engaged in interstate commerce.[27]

Another reason advanced to support the result of the cases which follow *Paul* v. *Virginia* has been that, if any as-

---

[26] Cf. *Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313, 317. "The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby and charged with great responsibility." *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389, 414. And see *Furst* v. *Brewster*, 282 U. S. 493, 497–498.

[27] Appraising the *Swift* case, Mr. Chief Justice Taft had this to say: "That case was a milestone in the interpretation of the commerce clause of the Constitution. It recognized the great changes and development in the business of this vast country and drew again the dividing line between interstate and intrastate commerce where the Constitution intended it to be. *It refused to permit local incidents of great interstate movement, which taken alone were intrastate, to characterize the movement as such.* [Italics supplied.] The *Swift* case merely fitted the commerce clause to the real and practical essence of modern business growth." *Chicago Board of Trade* v. *Olsen*, 262 U. S. 1, 35.

Compare *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.*, 293 U. S. 268, 274–277; *Stafford* v. *Wallace*, 258 U. S. 495, 518–519.

pects of the business of insurance be treated as interstate commerce, "then all control over it is taken from the States and the legislative regulations which this Court has heretofore sustained must be declared invalid."[28] Accepted without qualification, that broad statement is inconsistent with many decisions of this Court. It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation.[29] And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states.[30] In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated.[31] And the fact that partic-

[28] *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495, 509.

[29] See, e. g., *Crutcher* v. *Kentucky,* 141 U. S. 47, 59–61; *Atlantic Refining Co.* v. *Virginia,* 302 U. S. 22, 26; *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33.

[30] See *Gibbons* v. *Ogden,* 9 Wheat. 1, 200, 203–210; *Willson* v. *Black Bird Creek Marsh Co.,* 2 Pet. 245, 250–252; *License Cases,* 5 How. 504, Opinion of Mr. Chief Justice Taney, 578–586; *Cooley* v. *Board of Wardens,* 12 How. 299, 318–321; *Kelly* v. *Washington,* 302 U. S. 1, 9–10. Cf. *Sturges* v. *Crowninshield,* 4 Wheat. 122, 192–196; *Houston* v. *Moore,* 5 Wheat. 1, Opinion of Mr. Justice Story, 48–50.

[31] *Parker* v. *Brown,* 317 U. S. 341, 362–363; cf. *California* v. *Thompson,* 313 U. S. 109, 112–116; *South Carolina State Highway Dept.* v. *Barnwell Brothers,* 303 U. S. 177, 184–192, and cases cited therein in footnote 5; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 558–559; *Bowman* v. *Chicago & North Western Ry. Co.,* 125 U. S. 465, 482–483. That different members of the Court applying this test to a particular state statute may reach opposite conclusions as to its validity does not argue

ular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid.[32]

The real answer to the question before us is to be found in the Commerce Clause itself and in some of the great cases which interpret it. Many decisions make vivid the broad and true meaning of that clause. It is interstate commerce subject to regulation by Congress to carry lottery tickets from state to state. *Lottery Case*, 188 U. S. 321, 355. So also is it interstate commerce to transport a woman from Louisiana to Texas in a common carrier, *Hoke* v. *United States*, 227 U. S. 308, 320–323; to carry across a state line in a private automobile five quarts of whiskey intended for personal consumption, *United States* v. *Simpson*, 252 U. S. 465; to drive a stolen automobile from Iowa to South Dakota, *Brooks* v. *United States*, 267 U. S. 432, 436–439. Diseased cattle ranging between Georgia and Florida are in commerce, *Thornton* v. *United States*, 271 U. S. 414, 425; and the transmission of an electrical impulse over a telegraph line between Alabama and Florida is intercourse and subject to paramount federal regulation, *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, 11. Not only, then, may transactions be commerce though non-commercial; they may be commerce though illegal and

---

against the correctness of the test itself. Such differences in judgment are inevitable where solution of a Constitutional problem must depend upon considered evaluation of competing Constitutional objectives. See, e. g., *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33, 48, 59; *McCarroll* v. *Dixie Greyhound Lines*, 309 U. S. 176, 183; *Duckworth* v. *Arkansas*, 314 U. S. 390, 397; cf. *Gwin, White & Prince* v. *Henneford*, 305 U. S. 434, 442.

[32] See, e. g., *Cooley* v. *Board of Wardens*, 12 How. 299; *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495; cf. *Bowman* v. *Chicago & North Western Ry. Co.*, 125 U. S. 465, 482–483.

sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electrons and information. These activities having already been held to constitute interstate commerce, and persons engaged in them therefore having been held subject to federal regulation, it would indeed be difficult now to hold that no activities of any insurance company can ever constitute interstate commerce so as to make it subject to such regulation;—activities which, as part of the conduct of a legitimate and useful commercial enterprise, may embrace integrated operations in many states and involve the transmission of great quantities of money, documents, and communications across dozens of state lines.

The precise boundary between national and state power over commerce has never yet been, and doubtless never can be, delineated by a single abstract definition.[33] The most widely accepted general description of that part of commerce which is subject to the federal power is that given in 1824 by Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1, 189–190: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and

---

[33] *Lottery Case,* 188 U. S. 321, 363; cf. *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 520. This particular difficulty was recognized by the authors of the Federalist Papers: "All new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal, until their meaning be liquidated and ascertained by a series of particular discussions and adjudications. . . . Here, then, are three sources of vague and incorrect definitions: indistinctness of the object, imperfection of the organ of conception, inadequateness of the vehicle of ideas. Any one of these must produce a certain degree of obscurity. The Convention, in delineating the boundary between the federal and State jurisdictions must have experienced the full effect of them all." Federalist No. XXXVI, The Federalist (Rev. Ed., N. Y. 1901), pp. 193–194.

parts of nations, in all its branches. . . ." Commerce is interstate, he said, when it "concerns more States than one." *Id.*, 194. No decision of this Court has ever questioned this as too comprehensive a description of the subject matter of the Commerce Clause.[34] To accept a description less comprehensive, the Court has recognized, would deprive the Congress of that full power necessary to enable it to discharge its Constitutional duty to govern commerce among the states.[35]

The power confined to Congress by the Commerce Clause is declared in The Federalist to be for the purpose of securing the "maintenance of harmony and proper intercourse among the States."[36] But its purpose is not confined to empowering Congress with the negative authority

---

[34] "Commerce is intercourse: one of its most ordinary ingredients is traffic." *Brown* v. *Maryland*, 12 Wheat. 419, 446. "And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse." *Jordan* v. *Tashiro*, 278 U. S. 123, 127–128.

Commerce "comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities. . . ." *Welton* v. *Missouri*, 91 U. S. 275, 280. And "intercourse or communication between persons in different States, by means of correspondence through the mails, is commerce among the States within the meaning of the Constitution, especially where . . . such intercourse and communication really relates to matters of regular, continuous business and to the making of contracts and the transportation of books, papers, etc., appertaining to such business." *International Textbook Co.* v. *Pigg*, 217 U. S. 91, 107.

[35] See *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, 9.

"A government ought to contain in itself every power requisite to the full accomplishment of the objects committed to its care, and to the complete execution of the trusts for which it is responsible, free from every other control, but a regard to the public good and to the sense of the people." Federalist No. XXX, The Federalist, *supra*, 154.

[36] Federalist No. XL; Federalist No. XLI; The Federalist, *supra*, pp. 220, 231.

to legislate against state regulations of commerce deemed inimical to the national interest. The power granted Congress is a positive power. It is the power to legislate concerning transactions which, reaching across state boundaries, affect the people of more states than one;—to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing.[37] This federal power to determine the rules of intercourse across state lines was essential to weld a loose confederacy into a single, indivisible Nation; its continued existence is equally essential to the welfare of that Nation.[38]

Our basic responsibility in interpreting the Commerce Clause is to make certain that the power to govern intercourse among the states remains where the Constitution placed it. That power, as held by this Court from the beginning, is vested in the Congress, available to be exer-

---

[37] Compare Federalist No. XXIII, The Federalist, *supra*, 121: "Shall the Union be constituted the guardian of the common safety? Are fleets and armies, and revenues, necessary to this purpose? The government of the Union must be empowered to pass all laws, and to make all regulations which have relation to them. The same must be the case in respect to commerce, and to every other matter to which its jurisdiction is permitted to extend. . . . Not to confer in each case a degree of power commensurate to the end, would be to violate the most obvious rules of prudence and propriety, and improvidently to trust the great interests of the nation to hands which are disabled from managing them with vigor and success."
See Note (1943), 32 Georgetown Law Journal 66.

[38] The powers conferred by the Commerce Clause "are not confined to the instrumentalities of commerce . . . known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. . . . They were intended for the government of the business to which they relate, at all times and under all circumstances." *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1, 9. Compare Federalist No. XLIII, The Federalist, *supra*, 248.

cised for the national welfare as Congress shall deem necessary. No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance.

## II.

. We come then to the contention, earnestly pressed upon us by appellees, that Congress did not intend in the Sherman Act to exercise its power over the interstate insurance trade.

Certainly the Act's language affords no basis for this contention. Declared illegal in § 1 is "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . ."; and "every person" who shall make such a contract or engage in such a combination or conspiracy is deemed guilty of a misdemeanor. Section 2 is not less sweeping. "Every person" who monopolizes, or attempts to monopolize, or conspires with "any other person" to monopolize, "any part of the trade or commerce among the several States" is, likewise, deemed guilty of a misdemeanor. Language more comprehensive is difficult to conceive. On its face it shows a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states.

A general application of the Act to all combinations of business and capital organized to suppress commercial competition is in harmony with the spirit and impulses of the times which gave it birth. "Trusts" and "monopolies" were the terror of the period.[39] Their power to fix

---

[39] A historian of the Wheel, one of the strongest of the farmers' organizations in the '80's, had this to say about its origin: "The question has often been asked, what gave rise to the Wheel? This ques-

prices, to restrict production, to crush small independent traders, and to concentrate large power in the few to the detriment of the many, were but some of numerous evils ascribed to them.[40] The organized opponents of trusts aimed at the complete destruction of all business combinations which possessed potential power, or had the intent, to destroy competition in whatever the people needed or

tion is as easily answered as asked, *Monopoly!* . . . Monopoly aspires to make the people its servants, politically, financially and socially, and demands that we offer on its golden altar all that we are and have, souls, bodies, lives, liberty, and common country, unreservedly and without complaint." Morgan, History of the Wheel and Alliance (Fort Scott, Kan. 1889), p. 56. Compare *Slaughter-House Cases*, 16 Wall. 36 (1873), Dissenting opinions of Justices Field and Bradley, pp. 83, 101–110, 111, 119–121.

[40] See *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 491–493, 497–498; *Standard Oil Co.* v. *United States*, 221 U. S. 1, 58; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 322–325. See also *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30, 42–43.

Nor was the opposition to trusts limited to the monopolization of "goods and services." At the instance of Senator Ingalls of Kansas an amendment was added to the Sherman bill designed to tax out of existence the business of dealing in futures contracts. 21 Cong. Rec. 2613. The Ingalls amendment was adopted by the Senate without a record vote. *Id.* Subsequently the Sherman bill, as amended, was redrafted by the Senate Judiciary Committee which used substantially the same broad and sweeping language which Sections 1 and 2 of the Act contain today. With that language the Sherman bill had the support of Senator Ingalls and other proponents of the Ingalls amendment. 21 Cong. Rec. 3145, 3153. And see *United States* v. *Patten*, 226 U. S. 525; *Peto* v. *Howell*, 101 F. 2d 353; cf. *Chicago Board of Trade* v. *Olsen*, 262 U. S. 1; *Stafford* v. *Wallace*, 258 U. S. 495.

See, generally, Ashby, The Riddle of the Sphinx (Des Moines 1890); Morgan, History of the Wheel and Alliance (Fort Scott, Kan. 1889); Buck, The Granger Movement (Camb. 1913); Cloud, Monopolies and the People (Davenport, Iowa 1873); Weaver, A Call to Action (Des Moines 1892); Hicks, The Populist Revolt (Minneapolis 1931).

wanted.[41]   So great was the strength of the anti-trust
forces that the issue of trusts and monopolies became
non-partisan.   The   question   was   not   whether   they
should be abolished, but how this purpose could best be
accomplished.[42]

Combinations of insurance companies were not exempt
from public hostility against the trusts.   Between 1885
and 1912 twenty-three states enacted laws forbidding in-
surance combinations.[43]   When, in 1911, one of these state

[41] Representative of anti-trust platforms, resolutions, etc., of con-
temporary agrarian-political movements are the following: "We de-
mand . . . the passage of a law prohibiting the formation of trusts
and combinations by speculators to secure control of the necessaries of
life for the purpose of forcing up prices on consumers, imposing heavy
penalties" (Texas Farmers' State Alliance, Report of Committee on
Industrial Depression (1888)); "The objects of the National Alliance
are . . . to oppose all forms of monopoly as being detrimental to the
best interests of the public" (National Farmers' Alliance, Constitution
(1887)); "We hold to the principle that all monopolies are danger-
ous . . ., tending to enslave a free people . . ." (National Farmers'
Alliance and Industrial Union, Constitution (1889)); "We oppose the
tyranny of monopolies" (National Grange, Declaration of Purposes
(1874)).

[42] The platforms of both the Republican and the Democratic parties
in 1888 stated unqualified opposition to monopolies and trusts.   Bran-
don, Platforms of the Two Great Political Parties 1856–1928.   The
recorded vote in the House on the final conference report on the
Sherman Act shows 242 ayes, no nays, and 85 not voting.   21 Cong.
Rec. 6314.

[43] Four of these statutes were enacted before 1890.  L. N. H. 1885, ch.
93, p. 289; L. Ohio 1885, No. 284, p. 231; L. Mich. 1887, No. 285, p.
384; L. Kan. 1889, ch. 257, p. 389, and L. Kan. 1897, ch. 265, p. 481;
L. Ga. 1890–91, No. 745, p. 206; L. Maine 1893, ch. 285, p. 339; L. Mo.
1895, p. 237; L. Iowa 1896, ch. 22, p. 31; L. Ala. 1896–97, No. 634, p.
1428; L. Neb. 1897, ch. 79, p. 347; L. Neb. 1897, ch. 81, p. 354; L.
Neb. 1913, ch. 154, pp. 393, 419; L. Wis. 1897, ch. 356, p. 908; Acts
Va. 1898, ch. 644, p. 683; Acts S. C. 1902, No. 574, p. 1057; L. S. D.
1903, ch. 158, p. 183; G. L. Tex. 1903, ch. 94, p. 119; Ark. Acts 1905,

**556**

statutes was unsuccessfully challenged in this Court, the Court had this to say: "We can well understand that fire insurance companies, acting together, may have owners of property practically at their mercy in the matter of rates, and may have it in their power to deprive the public generally of the advantages flowing from competition between rival organizations engaged in the business of fire insurance. In order to meet the evils of such combinations or associations, the State is competent to adopt appropriate regulations that will tend to substitute competition in the place of combination or monopoly." *German Alliance Ins. Co.* v. *Hale*, 219 U. S. 307, 316.[44]

Appellees argue that the Congress knew, as doubtless some of its members did, that this Court had prior to 1890 said that insurance was not commerce and was subject to state regulation, and that therefore we should read the Act as though it expressly exempted that business. But neither by reports nor by statements of the bill's sponsors or others was any purpose to exempt insurance companies revealed. And we fail to find in the legislative history of the Act an expression of a clear and unequivocal desire of Congress to legislate only within that area previously

No. 1, p. 1, as amended by Ark. Acts 1907, No. 184, p. 430; P. L. N. C. 1905, ch. 424, p. 429, and P. L. N. C. 1915, ch. 166, p. 243; Acts Tenn. 1905, ch. 479, p. 1019; Miss. Code 1906, § 5002, adopted L. Miss. 1906, ch. 101, p. 78; Gen. L. Ore. 1909, ch. 230, pp. 388, 399; Sess. L. Wash. 1911, ch. 49, pp. 161, 195, and Sess. L. Wash. 1915, ch. 97, p. 278; L. Ariz. 1912, ch. 73, p. 354; Acts La. 1912, No. 224, p. 509.

[44] The farm organizations of this period did not rely solely upon prohibitory legislation to protect themselves from combinations of insurance companies. "In 1886, tired of the extortions of the old-line insurance companies, the Territorial Alliance appointed a committee . . . to devise and put in operation a system of mutual insurance . . ., the result of which has been eminently successful." Report of Alonzo Wardall, President of the Alliance Insurance Companies of the Dakotas, printed in Ashby, The Riddle of the Sphinx (Des Moines 1890), p. 363.

declared by this Court to be within the federal power.[45]
Cf. *Helvering* v. *Griffiths,* 318 U. S. 371; *Parker* v. *Motor
Boat Sales,* 314 U. S. 244. We have been shown not one
piece of reliable evidence that the Congress of 1890 in-
tended to freeze the proscription of the Sherman Act with-
in the mold of then current judicial decisions defining the
commerce power. On the contrary, all the acceptable

---

[45] We have been pointed to only one reference made to the business
of insurance in the Congressional discussions preceding passage of the
Sherman Act, and that is a statement of Senator Turpie which flatly
challenged the reasoning of this Court in holding that insurance was
not commerce, and further predicted that in the future the Commerce
Clause would not be given such a limited construction:

"The Senator from Missouri [Mr. Vest] spoke the other day about
the difficulty of defining the word 'commerce,' especially as contained
in the phrase 'interstate commerce.' I recollect one judicial decision
upon this subject very definitely. The Supreme Court has decided
that insurance is not commerce, and I suppose by following the circle
of negations long enough and excluding all the things not commerce
we should come at last to the residuum, which must be commerce
or interstate commerce, because it can be nothing else. *A fortiori,*
judging from this principle, I should myself have decided that trans-
portation is not commerce nor interstate commerce either. . . .

"I feel inclined to make the prediction, as one of the things to come
in this vast domain, scarcely touched, of cases arising under the Con-
stitution and laws of Congress, that the whole mass of merchantable
paper known as negotiable by the law merchant, made at one place,
negotiable at another, payable at another, transcending in its negotia-
tion State lines, will be remitted to Congressional action, and with re-
spect to its creation, its formation, its negotiation, with respect to all
the rights and liabilities which may arise under it, the people, stunned
with the eternal dissonance of conflicting decisions and judgments
of forty-eight or fifty tribunals of last resort in the States upon the
subject of interstate negotiable paper, will require Congress to act
therein, and that, unconstitutional as I now deem it or think it, it
will as a matter of necessity be done, and in any such legislation with
respect to that paper, the whole bulk of it, the personal and peculiar
conditions of litigants will not be inquired about, but simply whether
the one party or the other is entitled to relief or liable to recovery
against him by reason of being a party to interstate commercial paper,

evidence points the other way. That Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements such as the indictment here charges admits of little, if any, doubt.[46]

negotiable and payable and suable under the action of Congress which may finally take place upon that subject. . . .

"Nor do I think with the Senator from New York that we are discharged from duty or released from our obligation to legislate upon the subject of trusts because the States have a right to do so." 21 Cong. Rec. 2556–2557.

And see Note 48, *infra*.

[46] Senator George, a member of the Senate Judiciary Committee which redrafted the Sherman Act before its final passage, stated on the floor of the Senate that, "The bill has been very ingeniously and properly drawn to cover every case which comes within what is called the commercial power of Congress. . . . It is well known that the great evil of these combinations, these conspiracies, as they are called, these monopolies, as they are denominated by the bill, consists in the fact that by combination, by association, there have been gathered together the money and the means of large numbers of persons, and under these combinations, or conspiracies, or trusts, this great aggregated capital is wielded by a single hand and guided by a single brain, or at least by hands and brains acting in complete harmony and co-operation, and that in this way, by this association, by this direction of this immense amount of capital, by one organized will, to a very large extent, these wrongs have been perpetrated upon the American people." 21 Cong. Rec. 3147.

Earlier, Senator Sherman had explained, "I do not wish to single out any particular trust or combination. It is not a particular trust, but the system I aim at." 21 Cong. Rec. 2457. And in the House, Representative Stewart, delivering the last speech preceding the unanimous adoption of the present Act, stated ". . . The provisions of this trust bill are just as broad, sweeping, and explicit as the English language can make them to express the power of Congress over this subject under the Constitution of the United States. . . ." 21 Cong. Rec. 6314.

Compare *Kidd* v. *Pearson*, 128 U. S. 1 and *United States* v. *E. C. Knight Co.*, 156 U. S. 1, with *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211 and *United States* v. *American Tobacco Co.*, 221 U. S. 106.

The purpose was to use that power to make of ours, so far as Congress could under our dual system, a competitive business economy.[47]  Nor is it sufficient to justify our reading into the Act an exemption for insurance that the Congress of 1890 may have known that states already were regulating the insurance business.  The Congress of 1890 also knew that railroads were subject to regulation not only by states but by the federal government itself, but this fact has been held insufficient to bring to the railroad companies the interpretative exemption from the Sherman Act they have sought.  *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 314–315, 320–325.

Appellees further argue that, quite apart from what the Sherman Act meant in 1890, the succeeding Congresses have accepted and approved the decisions of this Court that the business of insurance is not commerce.  They call attention to the fact that at various times since 1890 Congress has refused to enact legislation providing for federal regulation of the insurance business, and that several resolutions proposing to amend the Constitution specifically to authorize federal regulation of insurance have failed of passage.  In addition they emphasize that, although the Sherman Act has been amended several times, no amendments have been adopted which specifically bring insurance within the Act's proscription.  The Government, for its part, points to evidence that various members of Congress during the period 1900–1914 considered there were "trusts" in the insurance business, and expressed the view that the insurance business should be subject to the anti-

---

[47] Senator Sherman, explaining his bill to the Senate, stated, "It is to arm the Federal courts within the limits of their constitutional power that they may co-operate with the State courts in checking, curbing, and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States."  21 Cong. Rec. 2457.

trust laws.[48]   It also points out that in the Merchant Marine Act of 1920 Congress specifically exempted certain conduct of marine insurance companies from the "antitrust" laws.[49]

The most that can be said of all this evidence considered together is that it is inconclusive as to any point here relevant.   By no means does it show that the Congress of 1890 specifically intended to exempt insurance companies from the all-inclusive scope of the Sherman Act.   Nor can we attach significance to the omission of Congress to include in its amendments to the Act an express statement that the Act covered insurance.   From the beginning Congress has used language broad enough to include all businesses, and never has amended the Act to define these businesses with particularity.   And the fact that several Congresses since 1890 have failed to enact proposed legislation providing for more or less comprehensive federal regula-

---

[48] For example, the following colloquy occurred in the House during the debate in passage of the Clayton Act:

"Mr. BARTON.   We had an illustration recently where a big fire insurance company came into the State where local insurance companies have been doing business, not confined to the border of the State, and cut prices in that immediate locality until we had in three States 40 or 50 local companies put out of business, and then the price was put back where it was profitable to the company.   Might not this same condition exist where we started a wholesale house in a State where their territory was confined to the State—might it not be a reduction of prices for putting that institution out of business?

"Mr. WEBB.   If the purpose is to wrongfully injure or destroy a competitor, this section will cover such practice; but insurance companies are not reached, as the Supreme Court has held that their contracts or policies are not interstate commerce.

"Mr. BARTON.   Is it not right that they should come within the law?

"Mr. WEBB.   Yes."   51 Cong. Rec. 9390.

So far as appears, this was the only mention of the insurance cases during the discussions leading to passage of the Clayton Act.   And, as in 1890, when the Sherman Act was under consideration, the reference to these cases showed dissatisfaction with them.   See note 45, *supra*.

[49] § 29 (b), 41 Stat. 988, 1000.

tion of insurance does not even remotely suggest that any Congress has held the view that insurance alone, of all businesses, should be permitted to enter into combinations for the purpose of destroying competition by coercive and intimidatory practices.

Finally it is argued at great length that virtually all the states regulate the insurance business on the theory that competition in the field of insurance is detrimental both to the insurers and the insured, and that if the Sherman Act be held applicable to insurance much of this state regulation will be destroyed. The first part of this argument is buttressed by opinions expressed by various persons that unrestricted competition in insurance results in financial chaos and public injury. Whether competition is a good thing for the insurance business is not for us to consider. Having power to enact the Sherman Act, Congress did so; if exceptions are to be written into the Act, they must come from the Congress, not this Court. And as was said in answer to a similar argument that the Sherman Act should not be applied to a railroad combination:

"It is the history of monopolies in this country and in England that predictions of ruin are habitually made by them when it is attempted, by legislation, to restrain their operations and to protect the public against their exactions. . . .

"But even if the court shared the gloomy forebodings in which the defendants indulge, it could not refuse to respect the action of the legislative branch of the Government if what it has done is within the limits of its constitutional power. The suggestions of disaster to business have, we apprehend, their origin in the zeal of parties who are opposed to the policy underlying the act of Congress or are interested in the result of this particular case; at any rate, the suggestions imply that the court may and ought to refuse the enforcement of the provisions of the

act if, in its judgment, Congress was not wise in prescribing as a rule by which the conduct of interstate and international commerce is to be governed, that every combination, whatever its form, in restraint of such commerce and the monopolizing or attempting to monopolize such commerce shall be illegal. These, plainly, are questions as to the policy of legislation which belong to another department, and this court has no function to supervise such legislation from the standpoint of wisdom or policy. . . ." Harlan, J., Affirming decree, *Northern Securities Co.* v. *United States*, 193 U. S. 197, 351–352.

The argument that the Sherman Act necessarily invalidates many state laws regulating insurance we regard as exaggerated. Few states go so far as to permit private insurance companies, without state supervision, to agree upon and fix uniform insurance rates. Cf. *Parker* v. *Brown*, 317 U. S. 341, 350–352. No states authorize combinations of insurance companies to coerce, intimidate, and boycott competitors and consumers in the manner here alleged, and it cannot be that any companies have acquired a vested right to engage in such destructive business practices.[50]

*Reversed.*

MR. JUSTICE ROBERTS and MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE STONE, dissenting:

This Court has never doubted, and I do not doubt, that transactions across state lines which often attend and are incidental to the formation and performance of an insurance contract, such as the use of facilities for interstate

---

[50] Whether reliance on earlier statements of this Court in the *Paul* v. *Virginia* line of cases that insurance is not "commerce" could ever be pleaded as a defense to a criminal prosecution under the Sherman Act is a question which has been suggested but one it is not necessary to discuss at this time.

communication and transportation, are acts of interstate commerce subject to regulation by the federal government under the commerce clause. Nor do I doubt that the business of insurance as presently conducted has in many aspects such interstate manifestations and such effects on interstate commerce as may subject it to the appropriate exercise of federal power. See *Polish Alliance* v. *Labor Board, post,* p. 643.

But such are not the questions now before us. We are not concerned here with the power of Congress to do what it has not attempted to do, but with the question whether Congress in enacting the Sherman Act has asserted its power over the business of insurance.

The questions which the Government has raised, advisedly it would seem (cf. *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495, 499), by the indictment in this case, as it has been interpreted by the District Court below, are quite different from the question, discussed in the Court's opinion, whether the incidental use of the facilities of interstate commerce and transportation in the conduct of the fire insurance business renders the business itself "commerce" within the meaning of the Sherman Act and the commerce clause. The questions here are whether the business of entering into contracts in one state, insuring against the risk of loss by fire of property in others, is itself interstate commerce; and whether an agreement or conspiracy to fix the premium rates of such contracts and in other ways to restrict competition in effecting policies of fire insurance, violates the Sherman Act. The court below has answered "no" to both of these questions. I think that its answer is right and its judgment should be affirmed, both on principle and in view of the permanency which should be given to the construction of the commerce clause and the Sherman Act in this respect, which has until now been consistently adhered to by all branches of the Government.

The case comes here on direct appeal by the Government from the District Court's judgment dismissing the indictment. Under the provisions of the Criminal Appeals Act, 18 U. S. C. § 682, the only questions open for decision here are whether the District Court's constructions of the commerce clause and of the Sherman Act, on which it rested its decision, are the correct ones. *United States* v. *Borden Co.,* 308 U. S. 188, 193; *United States* v. *Wayne Pump Co.,* 317 U. S. 200, 208; *United States* v. *Swift & Co.,* 318 U. S. 442, 444.

For the particular facts to which the court below applied the Constitution and the Sherman Act we must look to the indictment as the District Court has construed it. And we must accept that construction, for by the provisions of the Criminal Appeals Act the District Court's construction of the indictment is reviewable on appeal not by this Court but by the Circuit Court of Appeals. *United States* v. *Patten,* 226 U. S. 525, 535; *United States* v. *Colgate & Co.,* 250 U. S. 300, 306; *United States* v. *Borden Co., supra.*

The District Court pointed out that the offenses charged by the indictment are a conspiracy to fix arbitrary and non-competitive premium rates on fire insurance sold in several named states, and by means of that conspiracy to restrain and to monopolize trade and commerce in fire insurance in those states. The court went on to say:

"To constitute a violation of the Sherman Act, the restraint and monopoly denounced must be that of interstate trade or commerce, and, unless the restraint and monopoly charged in the indictment be restraint or monopoly in interstate trade or commerce, the indictment must fall.

"It is not a question here of whether the defendants participated in some incidental way in interstate commerce or used in some instances the facilities of interstate commerce, but is rather whether the activities complained

of as constituting the business of insurance would themselves constitute interstate trade or commerce, and whether defendants' method of conducting same amounted to restraint or monopoly of same. It is not a question as to whether or not Congress had power to regulate the insurance companies or some phases of their activities, but rather whether Congress did so by the Sherman Act.

"Persons may be engaged in interstate commerce, yet, if the restraint or monopoly complained of is not itself a restraint or monopoly of interstate trade or commerce, they may not be convicted of violation of the Sherman Act. The fact that they may use the mails and instrumentalities of interstate commerce and communication, and be subject to Federal regulations relating thereto, would not make applicable the Sherman Act to interstate commerce or to activities which were not commerce at all.

"The whole case, therefore, depends upon the question as to whether or not the business of insurance is interstate trade or commerce, and if so, whether the transactions alleged in the indictment constitute interstate commerce."

In short the District Court construed the indictment as charging restraints not in the incidental use of the mails or other instrumentalities of interstate commerce, nor in the insurance of goods moving in interstate commerce, but in the "business of insurance." And by the "business of insurance" it necessarily meant the business of writing contracts of insurance, for the indictment charges only restraints in entering into such contracts, not in their performance,[1] and the Court deemed it irrelevant that in

---

[1] It charges an agreement (a) to fix premium rates, (b) to fix commissions paid, (c) to adopt reclassifications of risks on the basis of which premium rates are fixed, (d) to adhere to standard terms, conditions, and clauses, in the insurance contract, (e) to withhold reinsurance facilities from non-members of the South-Eastern Underwriters

the negotiation and performance of the contracts appellees "may use the mails and instrumentalities of interstate commerce." It held that that business is not in itself interstate commerce, and that the alleged conspiracies to restrain and to monopolize that business were not, without more, in restraint of interstate commerce and consequently were not violations of the Sherman Act.

This construction of the indictment as confined in its scope to a conspiracy to fix premium rates and otherwise restrain competition in the business of writing insurance contracts, and to monopolize that business—a construction requiring decision of the question whether that business is interstate commerce—is adopted by the Government. Its brief in this Court states the "questions presented" as follows:

"1. Whether the fire insurance business is in commerce.

"2. Whether the fire insurance business is subject to the constitutional power of Congress to regulate commerce among the several states.

"3. Whether, if so, the Sherman Act is violated by an agreement among fire insurance companies to fix and maintain arbitrary and non-competitive rates and to monopolize trade and commerce in fire insurance, in part through boycotts directed at companies not part of the conspiracy and the agents and purchasers of insurance who deal with them."

---

Association, (f) to withdraw from and refuse to enter agencies representing non-members, (g) to boycott and withhold patronage from purchasers of insurance from non-members, (h) to disparage the services and facilities of non-members, (i) to establish and maintain rating bureaus to police and maintain these agreements, (j) to establish and maintain boards and groups of agents for the same purpose. There is no allegation that commissions are paid otherwise than on the entering into of the contracts. The indictment thus charges only restraints in the terms of the insurance contracts and restraints, by boycotts, in competition in entering into such contracts and in entering into contracts of reinsurance.

The numerous and unvarying decisions of this Court that "insurance is not commerce" [2] have never denied that acts of interstate commerce may be incidental to the business of writing and performing contracts of insurance, or that those incidental acts are subject to the commerce power. Our decisions on this subject have uniformly rested on the ground that the formation of an insurance contract, even though it insures against risk of loss to property located in other states or moving in interstate commerce, is not interstate commerce, and that although the incidents of interstate communication and transportation which often attend the formation and performance of an insurance contract are interstate commerce, they do not serve to render the business of insurance itself interstate commerce. See *Hooper* v. *California,* 155 U. S. 648, 655; *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495, 508–9.

If an insurance company in New York executes and delivers, either in that state or another, a policy insuring the owner of a building in New Jersey against loss by fire, no act of interstate commerce has occurred. True, if the owner comes to New York to procure the insurance or after delivery in New York carries the policy to New Jersey, or the company sends it there by mail or messenger, such would be acts of interstate commerce. Similarly if the owner pays the premiums by mail to the company in New

[2] E. g., *Paul* v. *Virginia,* 8 Wall. 168; *Ducat* v. *Chicago,* 10 Wall. 410; *Liverpool Insurance Co.* v. *Massachusetts,* 10 Wall. 566; *Philadelphia Fire Assn.* v. *New York,* 119 U. S. 110; *Hooper* v. *California,* 155 U. S. 648; *Noble* v. *Mitchell,* 164 U. S. 367; *Orient Insurance Co.* v. *Daggs,* 172 U. S. 557; *New York Life Ins. Co.* v. *Cravens,* 178 U. S. 389; *Nutting* v. *Massachusetts,* 183 U. S. 553; *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495; *Northwestern Mutual Life Ins. Co.* v. *Wisconsin,* 247 U. S. 132; *National Insurance Co.* v. *Wanberg,* 260 U. S. 71; *Bothwell* v. *Buckbee, Mears Co.,* 275 U. S. 274. See also *Doyle* v. *Continental Ins. Co.,* 94 U. S. 535, overruled on other grounds by *Terral* v. *Burke Construction Co.,* 257 U. S. 529.

York, or the company's New Jersey agent sends the premiums to New York, or the company in New York sends money to New Jersey on the occurrence of the loss insured against, acts of interstate commerce would occur. But the power of the Congress to regulate them is derived, not from its authority to regulate the business of insurance, but from its power to regulate interstate communication and transportation. And such incidental use of the facilities of interstate commerce does not render the insurance business itself interstate commerce. Nor is the nature of a single insurance transaction or a few such transactions not involving interstate commerce altered in that regard merely because their number is multiplied. The power of Congress to regulate interstate communication and transportation incidental to the insurance business is not any more or any less because the number of insurance transactions is great or small. The Congressional power to regulate does not extend to the formation and performance of insurance contracts save only as the latter may affect communication and transportation which are interstate commerce or may otherwise be found by Congress to affect transactions of interstate commerce. And even then, such effects on the commerce as do not involve restraints in competition in the marketing of goods and services are not within the reach of the Sherman Act. That such are the controlling principles has been fully recognized by this Court in the numerous cases which have held that the business of insurance is not commerce or as such subject to the commerce power. See, for example, *New York Life Ins. Co.* v. *Deer Lodge County, supra,* 508–9.

These principles are not peculiar to insurance contracts. They are equally applicable to other types of contracts which relate to things or events in other states than that of their execution, but which do not contain any obligation to engage in any form of interstate commerce. The

parties to them are not engaged in interstate commerce, for such commerce is not necessarily involved in or prerequisite to the formation of such contracts and they do not in their performance necessarily involve the doing of interstate business. The mere formation of a contract to sell and deliver cotton or coal or crude rubber is not in itself an interstate transaction and does not involve any act of interstate commerce because cotton, coal and crude rubber are subjects of interstate or foreign commerce, or because in fact performance of the contract may not be effected without some precedent or subsequent movement interstate of the commodities sold, or because there may be incidental use of the facilities of interstate commerce or transportation in the formation of the contract. *Ware & Leland* v. *Mobile County,* 209 U. S. 405, 411–13; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 253. Compare *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 292. That the principle underlying that conclusion is the same as that underlying the decisions of this Court that the business of insurance is not interstate commerce, has been repeatedly recognized and affirmed. *Paul* v. *Virginia,* 8 Wall. 168, 183; *Hooper* v. *California,* 155 U. S. 648, 654; *Ware & Leland* v. *Mobile County, supra,* 411; *Engel* v. *O'Malley,* 219 U. S. 128, 139; *New York Life Ins. Co.* v. *Deer Lodge County, supra,* 511–12; *Blumenstock Bros.* v. *Curtis Publishing Co.,* 252 U. S. 436, 443; *Hill* v. *Wallace,* 259 U. S. 44, 69; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 32–3; *Moore* v. *New York Cotton Exchange,* 270 U. S. 593, 604; *Western Live Stock* v. *Bureau of Revenue, supra;* and see *Hopkins* v. *United States,* 171 U. S. 578, 588–9, 602.

The conclusion that the business of writing insurance is not interstate commerce could not rightly be otherwise unless we were to depart from the universally accepted view that the act of making any contract which does not stipulate for the performance of an act or transaction of

interstate commerce is not in itself interstate commerce. And this has been held to be true even though the contract be effected by exchange of communications across state lines, see *New York Life Ins. Co.* v. *Cravens,* 178 U. S. 389, 400; *Ware & Leland* v. *Mobile County, supra; New York Life Ins. Co.* v. *Deer Lodge County, supra,* 509, a point which need not be considered here for the indictment makes no charge that the policies written by appellees are thus effected, but alleges only that they are "sold" by the defendants in certain named states.

Undoubtedly contracts so entered into for the sale of commodities which move in interstate commerce may become the implements for restraints in marketing those commodities, and when so used may for that reason be within the Sherman Act, see *Northern Securities Co.* v. *United States,* 193 U. S. 197, 334, 338; *United States* v. *Patten, supra,* 543–4; *Standard Oil Co.* v. *United States,* 283 U. S. 163, 168–9. Compare *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19. But it is quite another matter to say that the contracts are themselves interstate commerce or that restraints in competition as to their terms or conditions are within the Sherman Act, in the absence of a showing that the purpose or effect is to restrain competition in the marketing of the goods or services to which the contracts relate. Compare *Hill* v. *Wallace, supra,* 69, with *Chicago Board of Trade* v. *Olsen, supra,* 31–3; *Blumenstock Bros.* v. *Curtis Publishing Co., supra,* with *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.,* 293 U. S. 268; *Moore* v. *New York Cotton Exchange, supra,* with *United States* v. *Patten, supra.*

In this respect insurance contracts do not in point of law stand on any different footing as regards the Sherman Act. If contracts of insurance are in fact made the instruments of restraint in the marketing of goods and services in or affecting interstate commerce, they are not beyond the reach of the Sherman Act more than contracts

for the sale of commodities,—contracts which, not in themselves interstate commerce, may nevertheless be used as the means of its restraint. But since trade in articles of commerce is not the subject matter of contracts of insurance, it is evident that not only is the writing of insurance policies not interstate commerce but there is little scope for their use in restraining competition in the marketing of goods and services in or affecting the commerce.

The contract of insurance makes no stipulation for the sale or delivery of commodities in interstate commerce or for any other interstate transaction. It provides only for the payment of a sum of money in the event of the loss insured against, and it is no necessary consequence of the alleged restraints on competition in fixing premiums that interstate commerce will be restrained. We have no occasion to consider the argument which the court below rejected, that the indictment charges that the conspiracy to fix premiums adversely affects interstate commerce because in some instances the commodities insured move across state lines, or because interstate communication and transportation are in some instances incidental to the business of issuing insurance contracts. This is so both because, as we have said, we are bound by the District Court's construction of the indictment, and, more importantly, because such effects on interstate commerce, as will presently appear, are not within the reach of the Sherman Act.

The conclusion seems inescapable that the formation of insurance contracts, like many others, and the business of so doing, is not, without more, commerce within the protection of the commerce clause of the Constitution and thereby, in large measure, excluded from state control and regulation. See *Hooper* v. *California, supra,* 655; *New York Life Ins. Co.* v. *Deer Lodge County, supra.* This conclusion seems, upon analysis, not only correct on

principle and in complete harmony with the uniform rulings by which this Court has held that the formation of all types of contract which do not stipulate for the performance of acts of interstate commerce, are likewise not interstate commerce, but it has the support of an unbroken line of decisions of this Court beginning with *Paul* v. *Virginia*, seventy-five years ago, and extending down to the present time. In 1913 this Court was asked, on elaborate briefs and arguments, such as are now addressed to us, to overrule *Paul* v. *Virginia, supra,* and the many cases which have followed it. *New York Life Ins. Co.* v. *Deer Lodge County, supra.* See also *New York Life Ins. Co.* v. *Cravens, supra.* In the *Deer Lodge* case the mode of conducting the insurance business was almost identical with that alleged here (231 U. S. at 499–500); it was strenuously urged, as here, that by reason of the great size of insurance companies "modern life insurance had taken on essentially a national and international character" (231 U. S. at 507); and, as here, that the use of the mails incident to the formation of the contract and the interstate transmission of premiums and the proceeds of the policies "constitute 'a current of commerce among the states'" (231 U. S. at 509). All these arguments were rejected, and the business of insurance was held not to be interstate commerce, on the grounds which we have stated and think valid—but which the Government's brief and the opinion of the Court in this case have failed to notice.

If the business of entering into insurance contracts is not interstate commerce, it seems plain that agreements to fix premium rates, or other restraints on competition in entering into such contracts, are not violations of the Sherman Act. As we have often had occasion to point out, the restraints prohibited by the Sherman Act are of competition in the marketing of goods or services whenever the competition occurs in or affects interstate commerce in those goods or services. See *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 495–501, and cases cited. The contract of

insurance does not undertake to supply or market goods or services and there is no suggestion that policies of insurance when issued are articles of commerce or that after their issue they are sold in the market as such, or, if they were, that the formation of the contract would itself be interstate commerce. See *Hooper* v. *California, supra; New York Life Ins. Co.* v. *Deer Lodge County, supra,* 510; cf. *Ware & Leland* v. *Mobile County, supra; Moore* v. *New York Cotton Exchange, supra.*

No more does the performance of an insurance contract involving the payment of premiums by the insured and the payment of losses by the insurer involve the marketing of goods or services. The indictment here, as the District Court pointed out, charges restraints on competition in fixing the terms and conditions of insurance contracts. And even if we assume, although the District Court did not mention it, that the indictment also charges restraints on the performance of such contracts, it is plain that such restraints on the performance as well as the formation of the contracts cannot operate as restraints on competition in the marketing of goods or services. Such restraints are not within the purview of the Sherman Act. Compare *Federal Club* v. *National League,* 259 U. S. 200, 209; *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344, 410–411; *Blumenstock Bros.* v. *Curtis Publishing Co., supra; Moore* v. *New York Cotton Exchange, supra.* The practice of law is not commerce, nor, at least outside the District of Columbia, is it subject to the Sherman Act, and it does not become so because a law firm attracts clients from without the state or sends its members or juniors to other states to argue cases, or because its clients use the interstate mails to pay their fees. *Federal Club* v. *National League, supra.*

It would be strange, indeed, if Congress, in adopting the Sherman Act in 1890, more than twenty years after this Court had supposedly settled the question, had considered that the business of insurance was interstate com-

merce or had contemplated that the Sherman Act was to apply to it. Nothing in its legislative history suggests that it was intended to apply to the business of insurance.[3] The legislative materials indicate that Congress was primarily concerned with restraints of competition in the marketing of goods sold in interstate commerce, which were clearly within the federal commerce power.[4] And while the Act is not limited to restraints of commerce in physical goods, see *e. g., Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427, there is no reason to suppose that Congress intended the Act to apply to matters in which, under prevailing decisions of this Court, commerce was not involved. On the contrary the House committee, in reporting the bill which was adopted without change, declared: "No attempt is made to invade the legislative authority of the several States or even to occupy doubtful grounds. No system of laws can be devised by Congress alone which would effectually protect the people of the

---

[3] The decisions of this Court that the negotiation of a contract between citizens of different states is not interstate commerce were known to and accepted by Congress. In the course of the debates in the Senate on the original bill introduced by Senator Sherman, Senator Turpie, discussing the extent of the federal commerce power, stated, "I recollect one judicial decision upon this subject very definitely. The Supreme Court has decided that insurance is not commerce. . . ." 21 Cong. Rec. 2556. During subsequent debates on that bill Senator Hoar, who later took charge of the revised bill reported by the Judiciary Committee and ultimately enacted, 21 Cong. Rec. 3145 *et seq.*, denied the existence of federal substantive power, under the commerce clause or Article III, § 2, over contracts between citizens of different states, asserting that Senator Sherman's bill could be supported only as a regulation of the "importation, transportation, or sale of articles. . . ." 21 Cong. Rec. 2567. See also the statements of Senator Eustis at 21 Cong. Rec. 2646, 2651–2.

[4] See Senator Sherman's original bill, S. 3445, 50th Cong., S. 1, 51st Cong., and his statement at 21 Cong. Rec. 2562. Texts of the bill throughout its various amendments are set out in Bills and Debates Relating to Trusts, Sen. Doc. No. 147, 57th Cong., 2d Sess. (1903).

United States against the evils and oppression of trusts and monopolies. Congress has no authority to deal, generally, with the subject within the States, and the States have no authority to legislate in respect of commerce between the several States or with foreign nations." [5]

In 1904 and again in 1905 President Roosevelt urged "that the Congress carefully consider whether the power of the Bureau of Corporations cannot constitutionally be extended to cover interstate transactions in insurance." [6]

---

[5] H. R. Rep. No. 1707, 51st Cong., 1st Sess., p. 1. See also the statement on the floor of the House by Mr. Culberson, in charge of the bill, "There is no attempt to exercise any doubtful authority on this subject, but the bill is confined strictly and alone to subjects over which, confessedly, there is no question about the legislative power of Congress . . ." 21 Cong. Rec. 4089. And see the statement of Senator Edmunds, chairman of the Senate Judiciary Committee which reported out the bill in the form in which it passed, that in drafting that bill the committee thought that "we would frame a bill that should be clearly within our constitutional power, that we should make its definition out of terms that were well known to the law already, and would leave it to the courts in the first instance to say how far they could carry it or its definitions as applicable to each particular case as it might arise." 21 Cong. Rec. 3148. Similarly Senator Hoar, a member of that committee who with Senator Edmunds was in charge of the bill, stated "Now we are dealing with an offense against interstate or international commerce, which the State can not regulate by penal enactment, and we find the United States without any common law. The great thing that this bill does, except affording a remedy, is to extend the common-law principles, which protected fair competition in trade in old times in England, to international and interstate commerce in the United States." 21 Cong. Rec. 3152.

[6] Messages of the Presidents, 6901, 6986-7. See the Report of the Commissioner of Corporations, 1905, p. 5, urging that Congress "so legislate upon the subject as to afford an opportunity to present to the Supreme Court the question whether insurance as now conducted is interstate commerce, and hence subject to Federal regulation."

See also Sen. Doc. No. 333, 59th Cong., 1st Sess. (1906), for a message of President Roosevelt proposing an insurance code for the District of Columbia and enclosing a report of a convention of State officers called by him to investigate wrongful insurance methods.

The American Bar Association, executives of leading insurance companies, and others joined in the request.[7] Numerous bills providing for federal regulation of various aspects of the insurance business were introduced between 1902 and 1906 [8] but the judiciary committees of both House and Senate concluded that the regulation of the business of marine, fire and life insurance was beyond Congressional power. Sen. Rep. No. 4406, 59th Cong., 1st Sess.; H. R. Rep. No. 2491, 59th Cong., 1st Sess., 12–25. The House committee stated that "the question as to whether or not insurance is commerce has passed beyond the realm of argument, because the Supreme Court of the United States has said many times for a great number of years that insurance is not commerce." (p. 13.)[9]

---

[7] See, e. g., 29 American Bar Association Reports 538 (1906); 24 Annals of American Academy of Political and Social Sciences (1904) 69, 78–83; 26 *Id.* (1905) 681; Dryden, An Address on the Regulation of Insurance by Congress (1904); 1 Moody's Magazine (1905–6) 271 *et seq.;* 38 American Law Review (1904) 181.

[8] H. R. 7054, 58th Cong., 2d Sess. (1903); H. R. 13791, 58th Cong., 2d Sess. (1904); H. R. 16274, 58th Cong., 3d Sess. (1904); S. 7277, 58th Cong., 3d Sess. (1905); H. R. 15092, 59th Cong., 1st Sess. (1906); H. Res. No. 417, 59th Cong., 1st Sess. (1906). See footnote 9 *infra.* See also S. 1743, 56th Cong., 1st Sess. (1899).

[9] Compare the debates in the House on the bill, S. 569, to establish a Department of Commerce and Labor. As reported by the House Committee on Interstate and Foreign Commerce, § 6 of the bill provided for the creation of a bureau of insurance to "exercise such control as may be provided by law" over insurance companies and to "foster, promote, and develop" the insurance business by collecting and compiling statistics. H. R. Rep. No. 2970, 57th Cong., 2d Sess., 12, 15. After extended debate, in which the provision was objected to for want of power in the federal government to regulate the insurance business and as a threat to the continuance of existing state regulation, 36 Cong. Rec. 868–9, 872–3, 908–11, 919–21, and in which it was insisted by proponents of the bill, as now, that insurance is commerce, 36 Cong. Rec. 876–7, amendments to strike all reference to insurance from the bill were adopted. 36 Cong. Rec. 911, 921. A proposed amendment to prohibit the use of the mails by insurance companies doing business

And when in 1914, one year after the decision in *New York Life Ins. Co.* v. *Deer Lodge County, supra,* Congress by the Clayton Act, 38 Stat. 730, amended the Sherman Act and defined the term "commerce" as used in that Act, it gave no indication that it questioned or desired this Court to overrule the decision of the *Deer Lodge* case and those preceding it. On the contrary Mr. Webb, who was in charge of the bill in the House of Representatives, stated that "insurance companies are not reached as the Supreme Court has held that their contracts or policies are not interstate commerce." 51 Cong. Rec. 9390.[10]

in violation of state law was likewise defeated. 36 Cong. Rec. 922–3. The conference committee then inserted the provision, adopted as § 6 of the Act, 32 Stat. 828, authorizing the Bureau of Corporations to compile and publish useful information concerning corporations doing business in the United States and engaged in interstate or foreign commerce, "including corporations engaged in insurance." Upon assurances that this section "simply authorizes information being secured" and that "there is nothing in this measure that contravenes the votes of the House on that subject," 36 Cong. Rec. 2008, the conference report was adopted. The insurance provisions were not in the bill as it had originally passed the Senate, and the conference report was adopted by that body without debate. 36 Cong. Rec. 1990, 2035–6.

The Commissioner of Corporations made a study of state legislation, but reported that "in view of the decisions of the Supreme Court I have not felt warranted in trying to assume jurisdiction over insurance companies for the purpose of investigation." Report of the Commissioner of Corporations, 1905, p. 5; see Report of the Commissioner of Corporations, 1904, pp. 29–33; Report of the Secretary of Commerce and Labor, 1903, p. 26.

[10] Mr. Webb's statement was made in answer to an inquiry by Mr. Barton as to whether the proposed section 2 of the Clayton Act would render illegal certain practices if engaged in by wholesalers, in the course of which Mr. Barton referred to an instance of such practices committed by insurance companies. The colloquy continued:

"Mr. BARTON. It is not right that they should come within the law?

Mr. WEBB. Yes."

Assuming that Mr. Webb's answer related to insurance companies, and expressed a desire that such companies should be included within

This Court, throughout the seventy-five years since the decision of *Paul* v. *Virginia,* has adhered to the view that the business of insurance is not interstate commerce.[11] Such has ever since been the practical construction by the other branches of the Government of the application to insurance of the commerce clause and the Sherman Act. Long continued practical construction of the Constitution or a statute is of persuasive force in determining its meaning and proper application. *Pocket Veto Case,* 279 U. S. 655, 688-90; *Federal Trade Commission* v. *Bunte Bros.,* 312 U. S. 349, 351-2; *United States* v. *Cooper Corp.,* 312 U. S. 600, 613-14. It is significant that in the fifty years since the enactment of the Sherman Act the Government has not until now sought to apply it to the business of insurance,[12] and that Congress has continued to regard

the prohibitions of the Sherman and Clayton Acts, but were not, nothing was done to amend those Acts so as to carry out that desire or which would require this Court to reexamine the scope of federal power over insurance.

[11] For cases arising under the Anti-Trust laws in which this Court has so stated see *Hopkins* v. *United States,* 171 U. S. 578, 602; *Blumenstock Bros.* v. *Curtis Publishing Co.,* 252 U. S. 436, 443; *Federal Club* v. *National League,* 259 U. S. 200, 209; *Standard Oil Co.* v. *United States,* 283 U. S. 163, 168-9; and see *Northern Securities Co.* v. *United States,* 193 U. S. 197, 372, 377 (dissenting opinion). See also *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344, 410; *United Leather Workers* v. *Herkert & Meisel Co.,* 265 U. S. 457, 470-71, relying on *Ware & Leland* v. *Mobile County,* 209 U. S. 405, a case applying the insurance rule to cotton futures contracts not calling for interstate shipment or delivery.

[12] One private suit was brought in the District of Columbia to enjoin rate-fixing by an underwriters' association; the suit was dismissed on the ground that insurance was not commerce. *Lown* v. *Underwriters' Assn.,* Sup. Ct. D. C. June 23, 1915, reported in 6 Federal Anti-Trust Decisions 1048.

Over 252 criminal prosecutions and 272 suits at equity have been instituted by the United States under the Sherman Act, Hamilton, Antitrust in Action, Monograph No. 16, prepared for the Temporary

insurance as not constituting interstate commerce. Although often asked to do so it has repeatedly declined to pass legislation regulating the insurance business and to sponsor constitutional amendments subjecting it to Congressional control.[13]

The decision now rendered repudiates this long-continued and consistent construction of the commerce clause and the Sherman Act. We do not say that that is in itself a sufficient ground for declining to join in the Court's decision. This Court has never committed itself to any rule or policy that it will not "bow to the lessons of experience and the force of better reasoning" by overruling a mistaken precedent. See cases collected in Justice Brandeis's dissenting opinion in *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–9, notes 1–4, and in *Smith* v. *Allwright*, 321 U. S. 649, 665, n. 10; and see *Legal Tender Cases*, 12 Wall. 457, 553–54. This is especially the case when the meaning of the Constitution is at issue and a mistaken construction is one which cannot be corrected by legislative action.

To give blind adherence to a rule or policy that no decision of this Court is to be overruled would be itself to overrule many decisions of the Court which do not accept that view. But the rule of *stare decisis* embodies a wise policy because it is often more important that a rule of law be settled than that it be settled right. This is especially so where, as here, Congress is not without regulatory power. Cf. *Penn Dairies* v. *Milk Control Comm'n*, 318 U. S. 261, 271, 275. The question then is not whether an earlier decision should ever be overruled, but whether a

National Economic Committee (1940) 76, 78, and over 103 private actions have been brought, Note, 49 Yale L. J. 284, 296 (1939).

[13] In addition to the bills at note 8, *supra*, see H. J. Res. 31, 60th Cong., 1st Sess. (1907); S. J. Res. 103, 63d Cong., 2d Sess. (1914); H. J. Res. 194, 63d Cong., 2d Sess. (1914); S. J. Res. 58, 64th Cong., 1st Sess. (1915); S. J. Res. 51, 73d Cong., 1st Sess. (1933), all proposing constitutional amendments.

particular decision ought to be. And before overruling a precedent in any case it is the duty of the Court to make certain that more harm will not be done in rejecting than in retaining a rule of even dubious validity. Compare *Helvering* v. *Griffiths,* 318 U. S. 371, 400–4.

From what has been said it seems plain that our decisions that the business of insurance is not commerce are not unsound in principle, and involve no inconsistency or lack of harmony with accepted doctrine. They place no field of activity beyond the control of both the national and state governments as did *Hammer* v. *Dagenhart,* 247 U. S. 251, overruled three years ago by a unanimous Court in *United States* v. *Darby,* 312 U. S. 100, 117. On the contrary the ruling that insurance is not commerce, and is therefore unaffected by the restrictions which the commerce clause imposes on state legislation, removed the most serious obstacle to regulation of that business by the states. Through their plenary power over domestic and foreign corporations which are not engaged in interstate commerce, the states have developed extensive and effective systems of regulation of the insurance business, often solving regulatory problems of a local character with which it would be impractical or difficult for Congress to deal through the exercise of the commerce power. And in view of the broad powers of the federal government to regulate matters which, though not themselves commerce, nevertheless affect interstate commerce, *Wickard* v. *Filburn,* 317 U. S. 111; *Polish Alliance* v. *Labor Board, supra,* there can be no doubt of the power of Congress if it so desires to regulate many aspects of the insurance business mentioned in this indictment.

But the immediate and only practical effect of the decision now rendered is to withdraw from the states, in large measure, the regulation of insurance and to confer it on the national government, which has adopted no legis-

lative policy and evolved no scheme of regulation with respect to the business of insurance. Congress having taken no action, the present decision substitutes, for the varied and detailed state regulation developed over a period of years, the limited aim and indefinite command of the Sherman Act for the suppression of restraints on competition in the marketing of goods and services in or affecting interstate commerce, to be applied by the courts to the insurance business as best they may.

In the years since this Court's pronouncement that insurance is not commerce came to be regarded as settled constitutional doctrine, vast efforts have gone into the development of schemes of state regulation and into the organization of the insurance business in conformity to such regulatory requirements. Vast amounts of capital have been invested in the business in reliance on the permanence of the existing system of state regulation. How far that system is now supplanted is not, and in the nature of things could not well be, explained in the Court's opinion. The Government admits that statutes of at least five states will be invalidated by the decision as in conflict with the Sherman Act, and the argument in this Court reveals serious doubt whether many others may not also be inconsistent with that Act. The extent to which still other state statutes will now be invalidated as in conflict with the commerce clause has not been explored in any detail in the briefs and argument or in the Court's opinion.

Certainly there cannot but be serious doubt as to the validity of state taxes which may now be thought to discriminate against the interstate commerce, cf. *Philadelphia Fire Assn.* v. *New York,* 119 U. S. 110; or the extent to which conditions may be imposed on the right of insurance companies to do business within a state; or in general the extent to which the state may regulate whatever aspects of the business are now for the first time to be

regarded as interstate commerce. While this Court no longer adheres to the inflexible rule that a state cannot in some measure regulate interstate commerce, the application of the test presently applied requires "a consideration of all the relevant facts and circumstances" in order to determine whether the matter is an appropriate one for local regulation and whether the regulation does not unduly burden interstate commerce, *Parker* v. *Brown*, 317 U. S. 341, 362—a determination which can only be made upon a case-to-case basis. Only time and costly experience can give the answers.

Congress made the choice against so drastic a change when in 1906 it rejected the proposals to assume national control over the insurance business. The report of the House Committee on the Judiciary pointed out that "all of the evils and wrongs complained of are subject to the exclusive regulation of State legislative power" and added: "assuming that Congress declares that insurance is commerce and the Supreme Court holds the legislation constitutional, how much could Congress regulate, and what effect would such legislation have? It would disturb the very substructure of government by precipitating a violent conflict between the police power of the States and the power of Congress to regulate interstate commerce. To uphold the Federal power would be to extinguish the police power of the State by the legislation of Congress. In other words, Congress would admit corporations into the respective States and have the entire regulating power." H. R. Rep. No. 2491, 59th Cong., 1st Sess., 13, 15–16. See *id.* 18.

Had Congress chosen to legislate for such parts of the insurance business as could be found to affect interstate commerce, whether by making the Sherman Act applicable to them or by regulation in some other form, it could have resolved many of these questions of conflict between

federal and state regulation. But this Court can decide only the questions before it in particular cases. Its action in now overturning the precedents of seventy-five years governing a business of such volume and of such wide ramifications, cannot fail to be the occasion for loosing a flood of litigation and of legislation, state and national, in order to establish a new boundary between state and national power, raising questions which cannot be answered for years to come, during which a great business and the regulatory officers of every state must be harassed by all the doubts and difficulties inseparable from a realignment of the distribution of power in our federal system. These considerations might well stay a reversal of long-established doctrine which promises so little of advantage and so much of harm. For me these considerations are controlling.

The judgment should be affirmed.

MR. JUSTICE FRANKFURTER:

I join in the opinion of the CHIEF JUSTICE.

The relations of the insurance business to national commerce and finance, I have no doubt, afford constitutional authority for appropriate regulation by Congress of the business of insurance, certainly not to a less extent than Congressional regulation touching agriculture. See, e. g., Smith v. Kansas City Title Co., 255 U. S. 180; Wickard v. Filburn, 317 U. S. 111. But the opinion of the CHIEF JUSTICE leaves me equally without doubt that by the enactment of the Sherman Act in 1890, Congress did not mean to disregard the then accepted conception of the constitutional basis for the regulation of the insurance business. And the evidence is overwhelming that the inapplicability of the Sherman Act, in its contemporaneous setting, to insurance transactions such as those charged by this indictment has been confirmed and not modified by

Congressional attitude and action in the intervening fifty years. There is no Congressional warrant therefore for bringing about the far-reaching dislocations which the opinions of the CHIEF JUSTICE and MR. JUSTICE JACKSON adumbrate.

MR. JUSTICE JACKSON, dissenting in part:

## I.

The historical development of public regulation of insurance underwriting in this country has created a dilemma which confronts this Court today. It demonstrates that "The life of the law has not been logic: it has been experience."

For one hundred fifty years Congress never has undertaken to regulate the business of insurance. Therefore to give the public any protection against abuses to which that business is peculiarly susceptible the states have had to regulate it. Since 1851 the several states, spurred by necessity and with acquiescence of every branch of the Federal Government, have been building up systems of regulation to discharge this duty toward their inhabitants.[1]

There never was doubt of the right of a state to regulate the business of its domestic companies done within the home state. The foreign corporation was the problem. Such insurance interests resisted state regulation and brought a series of cases to this Court. The companies sought to disable the states from regulating them by arguing that insurance business is interstate commerce, an argument almost identical with that now made by the

---

[1] Insurance commissions were established by New Hampshire in 1851 (N. H. Laws 1851, c. 1111); by Massachusetts in 1852 (Mass. Laws 1852, c. 231); by Rhode Island in 1855 (R. I. Laws, October 1854, p. 17, § 17). By 1890, when the Sherman Act became law, seventeen states had established supervisory authorities. Patterson, The Insurance Commissioner in the United States (1927), p. 536, n. 62.

Government.[2]  The foreign companies thus sought to vest insurance control exclusively in Congress and to deprive every state of power to exclude them, to regulate them, or to tax them for the privilege of doing business.

The practical and ultimate choice that faced this Court was to say either that insurance was subject to state regulation or that it was subject to no existing regulation at all. The Court consistently sustained the right of the states to represent the public interest in this enterprise.  It did so, wisely or unwisely, by resort to the doctrine that insurance is not commerce and hence is unaffected by the grant of power to Congress to regulate commerce among the several states.  Each state thus was left free to exclude foreign insurance companies altogether or to admit them to do business on such conditions as it saw fit to impose. The whole structure of insurance regulation and taxation as it exists today has been built upon this assumption.[3]

The doctrine that insurance business is not commerce always has been criticized as unrealistic, illogical, and inconsistent with other holdings of the Court.   I am unable to make any satisfactory distinction between insurance business as now conducted and other transactions that are held to constitute interstate commerce.[4]  Were we con-

---

[2] See particularly argument of New York Life Insurance Company in *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495, 496 (1913), and that for Paul in *Paul* v. *Virginia*, 8 Wall. 168 (1868).

[3] *Paul* v. *Virginia*, 8 Wall. 168, 183 (1868); *Hooper* v. *California*, 155 U. S. 648, 655 (1895); *Noble* v. *Mitchell*, 164 U. S. 367, 370 (1896); *New York Life Ins. Co.* v. *Cravens*, 178 U. S. 389, 401 (1900); *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495 (1913); *Bothwell* v. *Buckbee, Mears Co.*, 275 U. S. 274; *Ducat* v. *Chicago*, 10 Wall. 410; *Liverpool Insurance Co.* v. *Massachusetts*, 10 Wall. 566; *Philadelphia Fire Assn.* v. *New York*, 119 U. S. 110; *Nutting* v. *Massachusetts*, 183 U. S. 553; *Northwestern Mutual Life Ins. Co.* v. *Wisconsin*, 247 U. S. 132.

[4] E. g., *Champion* v. *Ames*, 188 U. S. 321 (lottery tickets); *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n*, 303 U. S. 419 (holding companies).

sidering the question for the first time and writing upon a clean slate, I would have no misgivings about holding that insurance business is commerce and where conducted across state lines is interstate commerce and therefore that congressional power to regulate prevails over that of the states. I have little doubt that if the present trend continues federal regulation eventually will supersede that of the states.

The question therefore for me settles down to this: What role ought the judiciary to play in reversing the trend of history and setting the nation's feet on a new path of policy? To answer this I would consider what choices we have in the matter.

## II.

The Government claims, and we must approve or reject the claim, that the antitrust laws constitute an exercise of congressional power which reaches the insurance business. That might be true on either of two different bases. The practical as well as the theoretical difference is substantial, as this case will show.

1. If an activity is held to be interstate commerce, Congress has paramount regulatory power. If it acts at all in relation to such a subject, it often has been held that it has "occupied the field" to the exclusion of the states, that the federal legislation defines the full measure of regulation and outside of it the activity is to be free.[5] This Court now is not fully agreed as to the effects of the Commerce Clause on state power,[6] but at least the Court always has considered that if an activity is held to be interstate in character a state may not exclude, burden, or obstruct it,[7]

[5] E. g., *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566.

[6] *McCarroll* v. *Dixie Greyhound Lines,* 309 U. S. 176; *Duckworth* v. *Arkansas,* 314 U. S. 390.

[7] *Furst* v. *Brewster,* 282 U. S. 493, and cases cited.

nor impose a license tax on the privilege of carrying it on within the state.[8]   The holding of the Court in this case brings insurance within this line of decisions restricting state power.

2. Although an activity is held not to be commerce or not to be interstate in character, Congress nevertheless may reach it to prohibit specific activities in its conduct that substantially burden or restrain interstate commerce. *Wickard* v. *Filburn,* 317 U. S. 111.   When this power is exercised by Congress, it impairs state regulation only in so far as it actually conflicts with the federal regulation. *Terminal Railroad Association* v. *Brotherhood of Railroad Trainmen,* 318 U. S. 1.   This congressional power to reach activities that are not interstate commerce interferes with state power only in a milder, narrower, and more specific way.

Instead of overruling our repeated decisions that insurance is not commerce, the Court could apply to this case the principle that even if it is not commerce the antitrust laws prohibit its manipulation to restrain interstate commerce, just as we hold that the National Labor Relations Act prohibits insurance companies, even if not in commerce, from engaging in unfair labor practices which affect commerce.   *Polish Alliance* v. *Labor Board, post,* p. 643. This would require the Government to show that any acts it sought to punish affect something more than insurance and substantially affect interstate transportation or interstate commerce in some commodity.   Whatever problems of reconciliation between state and federal authority this would present—and it would not avoid them all—it would leave the basis of state regulation unimpaired.

The principles of decision that I would apply to this case are neither novel nor complicated and may be shortly put:

1. As a *matter of fact,* modern insurance business, as

---

[8] *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203; *Cudahy Packing Co.* v. *Hinkle,* 278 U. S. 460.

usually conducted, is commerce; and where it is conducted across state lines, it is *in fact* interstate commerce.

2. In contemplation of law, however, insurance has acquired an established doctrinal status not based on present-day facts. For constitutional purposes a fiction has been established, and long acted upon by the Court, the states, and the Congress, that insurance is not commerce.

3. So long as Congress acquiesces, this Court should adhere to this carefully considered and frequently reiterated rule which sustains the traditional regulation and taxation of insurance companies by the states.

4. Any enactment by Congress either of partial or of comprehensive regulations of the insurance business would come to us with the most forceful presumption of constitutional validity. The fiction that insurance is not commerce could not be sustained against such a presumption, for resort to the facts would support the presumption in favor of the congressional action. The fiction therefore must yield to congressional action and continues only at the sufferance of Congress.

5. Congress also may, without exerting its full regulatory powers over the subject, and without challenging the basis or supplanting the details of state regulation, enact prohibitions of any acts in pursuit of the insurance business which substantially affect or unduly burden or restrain interstate commerce.

6. The antitrust laws should be construed to reach the business of insurance and those who are engaged in it only under the latter congressional power. This does not require a change in the doctrine that insurance is not commerce. The statute as thus construed would authorize prosecution of all combinations in the course of insurance business to commit acts not required or authorized by state law, such as intimidation, disparagement, or coer-

cion, if they unreasonably restrain interstate commerce in commodities or interstate transportation.[9]  It would leave state regulation intact.

### III.

The majority of the sitting Justices insist that we follow the more drastic course.  Abstract logic may support them, but the common sense and wisdom of the situation seem opposed.  It may be said that practical consequences are no concern of a court, that it should confine itself to legal theory.  Of course, in cases where a constitutional provision or a congressional statute is clear and mandatory, its wisdom is not for us.  But the Court now is not following, it is overruling, an unequivocal line of authority reaching over many years.  We are not sustaining an act of Congress against attack on its constitutionality, we are making unprecedented use of the Act to strike down the constitutional basis of state regulation.  I think we not only are free, but are duty bound, to consider practical consequences of such a revision of constitutional theory. This Court only recently recognized that certain former decisions as to the dividing line between state and federal power were illogical and theoretically wrong, but at the same time it announced that it would adhere to them because both governments had accommodated the structure of their laws to the error.  *Davis* v. *Department of Labor,* 317 U. S. 249, 255.  It seemed a common-sense course to follow then, and I think similar considerations should restrain us from following a contrary and destructive course now.

---

[9] The Government contends that at least Count One of the present indictment conforms to this interpretation of the antitrust laws.  Under the Criminal Appeals Act we have no jurisdiction to construe or reconstrue the indictment.  My view would require remand to the District Court or the Circuit Court of Appeals for consideration in the light of our opinion.

The states began nearly a century ago to regulate insurance, and state regulation, while no doubt of uneven quality, today is a successful going concern. Several of the states, where the greatest volume of business is transacted, have rigorous and enlightened legislation, with enforcement and supervision in the hands of experienced and competent officials. Such state departments, through trial and error, have accumulated that body of institutional experience and wisdom so indispensable to good administration. The Court's decision at very least will require an extensive overhauling of state legislation relating to taxation and supervision. The whole legal basis will have to be reconsidered. What will be irretrievably lost and what may be salvaged no one now can say, and it will take a generation of litigation to determine. Certainly the states lose very important controls and very considerable revenues.[10]

The recklessness of such a course is emphasized when we consider that Congress has not one line of legislation deliberately designed to take over federal responsibility for this important and complicated enterprise.[11] There is no federal department or personnel with national experience

---

[10] In 1943, gross premiums taxes on insurance companies yielded 40 states an aggregate of $96,108,000 and the remaining eight an estimated $26,892,000, making a total of $123,000,000. State Tax Collections in 1943, pamphlet published by Bureau of the Census, p. 8.

[11] It is impossible to believe that Congress, if it ever intended to assume responsibility for general regulation of insurance, would have made the antitrust laws the sole manifestation of its purpose. Its only command is to refrain from restraints of trade. Intelligent insurance regulation goes much further. It requires careful supervision to ascertain and protect solvency, regulation which may be inconsistent with unbridled rate competition. It prescribes some provisions of policies of insurance and many other matters beyond the scope of the Sherman Act.

Also it requires sanctions for obedience far more effective than the $5,000 maximum fine on corporations prescribed by the antitrust laws. Violation of state laws are commonly punishable by cancellation of

in the subject on which Congress can call for counsel in framing regulatory legislation. A poorer time to thrust upon Congress the necessity for framing a plan for nationalization of insurance control would be hard to find.

Moreover, we have not a hint from Congress that it concurs in the plan to federalize responsibility for insurance supervision. Indeed, every indication is to the contrary.[12]

---

permission to do business therein—a drastic sanction that really commands respect.

The antitrust law sanctions are little better than absurd when applied to huge corporations engaged in great enterprise. In the two related *Madison Oil* cases (see *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150) fifteen of the seventeen corporations convicted had combined capital and surplus reported to be $2,833,516,247. The total corporate fines on them were $255,000, making a ratio of fines to corporate capital and surplus of less than $\frac{1}{100}$ of 1 per cent. In addition, fines of $180,000 were assessed against individuals. In the automobile financing case (see *United States* v. *General Motors Corp.*, 121 F. 2d 376, cert. denied, 314 U. S. 618) General Motors Corporation, three wholly owned subsidiaries and no individuals were convicted. The fines were $20,000. Capital and surplus were then reported at $1,047,840,321, the fine being somewhat less than $\frac{1}{500}$ of 1 per cent thereof.

In each case the corporate fines were $5,000, the maximum permitted by the statute. 15 U. S. C. § 1.

[12] The last agency to investigate insurance problems was the Temporary National Economic Committee. It made no recommendation of federal control. Its chairman, Senator O'Mahoney, after reviewing carefully the problems caused by the concentration of economic power in the hands of the insurance companies and the abuses of the business, said: "Therefore I say again that personally I would not support any law that would undertake to do away with state regulation of insurance, and there never has been suggested to me or to any member of the TNEC or to the committee as a whole any thought of doing away with state regulation or imposing federal supervision." 26 American Bar Association Journal 913. Both dominant political parties have supported the present system. In 1940, the Democratic platform contained this provision: "We favor strict supervision of all forms of the insurance business by the several States for the protection of policyholders and the public." The Republican platform of that

It was urged to do so by one President,[13] and by the insurance companies.[14] The decisions of this Court confirming state power over insurance have been paralleled by a history of congressional refusal to extend federal authority into the field,[15] although no decision ever has explicitly denied the power to do so.

year contained this provision: "We favor a continuance of regulation of insurance by the several States."

[13] President Theodore Roosevelt twice recommended that Congress assume control of insurance. Message of December 6, 1904, 39 Cong. Rec. 12, and Message of December 5, 1905, 40 Cong. Rec. 95.

[14] See Insurance Blue Book (Centennial Issue, 1876) Ch. VI, Fire Insurance, p. 32.

[15] In 1866, a bill was introduced in the House, providing for creation of a national bureau of insurance in the Treasury Department. It was not passed. H. R. 738, 39th Cong., 1st Sess.

In 1868, a bill was introduced in the Senate proposing a national bureau of insurance, but never passed. S. 299, 40th Cong., 2d Sess.

In 1892, a bill was introduced in the House creating the office of Commissioner of Insurance. It was never reported out of committee. H. R. 9629, 52d Cong., 1st Sess.

In 1897, a bill was introduced in the Senate to declare that insurance companies doing business outside of the states of their incorporation were to be deemed to be engaged in interstate commerce. It was not reported out of committee. S. 2736, 55th Cong., 2d Sess.

After President Roosevelt's recommendation of 1904, Senator Dryden introduced a bill in the Senate to establish a bureau of insurance in the Department of Commerce. The bill died in committee. S. 7277, 58th Cong., 3d Sess.

After President Roosevelt's second recommendation, the House Judiciary Committee reported that Congress had no power to regulate insurance, and said: "The views of the Supreme Court have practically met the approval of the bar and business men of the United States as being in accordance with law and common sense." H. R. Rep. 2491, 59th Cong., 1st Sess., March 23, 1906, p. 14.

The Senate Committee on the Judiciary made a similar report. Sen. Rep. 4406, 59th Cong., 1st Sess., 1906.

In 1914–15, resolutions were introduced in both the House and the Senate proposing an amendment to the Constitution to the effect that Congress should have power to regulate the business or commerce of

. The orderly way to nationalize insurance supervision, if it be desirable, is not by court decision but through legislation. Judicial decision operates on the states and the industry retroactively. We cannot anticipate, and more than likely we could not agree, what consequences upon tax liabilities, refunds, liabilities under state law to states or to individuals, and even criminal liabilities will follow this decision. Such practical considerations years ago deterred the Court from changing its doctrine as to insurance.[16] Congress, on the other hand, if it thinks the time has come to take insurance regulation into the federal system, may formulate and announce the whole scope and effect of its action in advance, fix a future effective date, and avoid all the confusion, surprise, and injustice which will be caused by the action of the Court.[17]

---

insurance throughout the United States and its territories or possessions. The resolutions were not reported out of the Judiciary Committee. S. J. Res. 103, 63d Cong., 2d Sess.; H. J. Res. 194, 63d Cong., 2d Sess.; S. J. Res. 58, 64th Cong., 1st Sess.

In 1933, a resolution was introduced for a similar constitutional amendment which died in committee. S. J. Res. 51, 73d Cong., 1st Sess.

Moreover, by exceptions and exemptions Congress has indicated a clear intent to avoid interference with state supervision. Insurance corporations are excepted from those who may become bankrupts. 11 U. S. C. § 22. Insurance issued by any issuer under state supervision is exempted from the Securities Act. 15 U. S. C. § 77c (a) (8). Insurance companies supervised by state authority are exempted from regulation as investment companies. 15 U. S. C. §§ 80a–2 (a) (17) and 80a–3 (c) (3).

[16] In *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495, 502, the Court said: "To reverse the cases, therefore, would require us to promulgate a new rule of constitutional inhibition upon the States and which would compel a change of their policy and a readjustment of their laws. Such result necessarily urges against a change of decision."

[17] In resisting pressure to federalize insurance supervision Congress has followed the advice of some of the best informed champions of

A judgment as to when the evil of a decisional error exceeds the evil of an innovation must be based on very practical and in part upon policy considerations. When, as in this problem, such practical and political judgments can be made by the political branches of the Government, it is the part of wisdom and self-restraint and good government for courts to leave the initiative to Congress.

Moreover, this is the method of responsible democratic government. To force the hand of Congress is no more

---

the public interest on insurance problems. One was Louis D. Brandeis. Speaking as counsel for the Protective Committee of Policy-holders in the Equitable Life Assurance Society, before the Commercial Club of Boston, on October 26, 1905, Mr. Brandeis said:

"The sole effect of a Federal law would be—the sole purpose of the Dryden bill [see note 15, *supra*] must have been—to free the companies from the careful scrutiny of the commissioners of some of the States. It seeks to rob the State even of the right to protect its own citizens from the legalized robbery to which present insurance measures subject the citizens, for by the terms of the bill a Federal license would secure the right to do business within the borders of the State, regardless of the State prohibitions, free from the State's protective regulations. With a frankness which is unusual—and an effrontery which is common—among the insurance magnates—this bill is introduced in the Senate by John F. Dryden, the president of the Prudential Life Insurance Company—the company which pays to stockholders annual dividends equivalent to 219.78 per cent. for each dollar paid in on the stock; the company which devotes itself mainly to insuring the working men at an expense of over 37.28 cents on every dollar of premiums paid; the company which, in 1904, made the worst record of lapsed and surrendered industrial policies. . . .

"Federal supervision is also advocated by Mr. James M. Beck (formerly Assistant Attorney General of the United States), the counsel for the Mutual Life Insurance Company, and his main argument against State supervision appears to be that the companies pay, in the aggregate, for fees and taxes in the several States $10,000,000, which he says is twice as much as is necessary to cover the expense of proper supervision. Ten million dollars is a large sum in itself, but a very small one compared with the aggregate assets or the aggregate

the proper function of the judiciary than to tie the hands of Congress. To use my office, at a time like this, and with so little justification in necessity, to dislocate the functions and revenues of the states [18] and to catapult Congress into immediate and undivided responsibility for supervision of the nation's insurance businesses is more than I can reconcile with my view of the function of this Court in our society.

---

expense of management. Mr. Beck's company paid in 1904 $1,138,663 in taxes and fees. Its management expenses were $15,517,520, or nearly fourteen times as much. Our Massachusetts savings banks paid in the year ending October 31, 1904, $1,627,794.46 in taxes to this Commonwealth: that is $80,890.02 more than the whole expense of management, which was $1,546,904.44.

"Doubtless the insurance departments of some States are subjects for just criticism. In many of the States the department is inefficient, in some doubtless corrupt. But is there anything in our experience of Federal supervision of other departments of business which should lead us to assume that it will be freer from grounds of criticism or on the whole more efficient than the best insurance department of any of the States? For it must be remembered that an efficient supervision by the department of any State will in effect protect all the policy-holders of the company wherever they may reside. Let us remember rather the ineffectiveness for eighteen long years of the Interstate Commerce Commission to deal with railroad abuses, the futile investigation by Commissioner Garfield of the Beef Trust, and the unfinished investigation into the affairs of the Oil Trust in which he has since been engaged. Federal supervision would serve only to centralize still further the power of our Government and to increase still further the powers of the corporations."

Mr. Justice Brandeis for a unanimous Court wrote, in *Bothwell* v. *Buckbee, Mears Co.*, 275 U. S. 274, 276 (1927): "A contract of insurance, although made with a corporation having its office in a State other than that in which the insured resides and in which the interest insured is located, is not interstate commerce." He joined in other similar decisions in *Northwestern Mutual Life Ins. Co.* v. *Wisconsin*, 247 U. S. 132; *National Union Fire Ins. Co.* v. *Wanberg*, 260 U. S. 71.

[18] Thirty-five states of the Union have filed *amicus curiae* briefs with us, protesting against the decision which the Court is promulgating.