## TOBIN v. HOUSEHOLD FINANCE CORP. et al.

### Civ. A. No. 10549.

United States District Court
E. D. Pennsylvania.

June 24, 1952.

William S. Tyson, Solicitor, John J. Babé, Asst. Solicitor, Washington, D. ·C., Earnest N. Votaw, Regional Atty., Louis Weiner, Regional Atty., Philadelphia, Pa., for plaintiff.

Souser & Schumacker, Philadelphia, Pa., Proskauer Rose Goetz & Mendelsohn, New York City, Hubachek & Kelly, Chicago, Ill., for defendant.

KIRKPATRICK, Chief Judge.

Houschold Finance Corporation (of which the other corporate defendant is a wholly owned subsidiary) operates a small loan business in over 300 cities in the United States and Canada, in 28 states and 8 provinces. Its main office is in Chicago and it is licensed to do business in Pennsylvania, under the Small Loan Law of that state. The question presented by this action, brought by the Secretary of Labor, is whether the employees of the defendant's office at Lancaster, Pennsylvania, are covered by the Fair Labor Standards Act. Most of the relevant facts relating to the scope and character of the defendant's business and the kind of work done by the employees at Lancaster have been stipulated, leaving two specific issues to be determined:

(1) Are the defendant's employees engaged in commerce, so as to make the Fair Labor Standards Act applicable to them?

(2) Is the Lancaster office a retail or service establishment, within the meaning of Section 13(a) (2), 29 U.S.C.A. § 213, which exempts employees of such establishments from the coverage of the Act?

## (1)

The applicability of the Fair Labor Standards Act depends upon the character of the employee's work. The employer may be in commerce or in the production of goods for commerce and the employee not. That the employer is so engaged, while not decisive, is always a relevant fact bearing upon the relation of the employee's activities to interstate commerce. Sometimes it may not be a very important consideration. Thus, where the employee is engaged in one of those auxiliary activities which are not essential to the employer's business, as for example in McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, the fact that the employer is in commerce, is only a starting point. On the other hand, where the employee's activities are so intimately connected with the business as to be an essential part of it, the fact that it is an interstate business will bring the employee under the coverage of the Act. Such a case is that now before the Court.

These employees are actually conducting the defendant's business. Of course, they are not conducting the whole ·business, but, without them and hundreds of others who are doing the same things that they are doing, in other cities, there would be no business. They pay out the money loaned and make the collections (which operations really constitute the business) and they keep the books and records, transmit the balances and make the reports, all of which activities are so closely connected with the business as to be an indispensable part of it.

The decision of the Supreme Court in U. S. v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, on the question of the interstate character of the business of the defendant in that case, is controlling here and compels the holding that Household is in commerce. Naturally, there are differences between the insurance business and small loan banking. For one thing, the loan contracts in the present case, which are the heart of the business, are not made at the home office in Chicago and the instruments evidencing the loans are not transmitted across state lines, as in the case of policies of insurance. This, however, is a difference in detail only. In this case, money, the assets of the defendant used directly by it for its business, flows from its banks and depositories in Chicago to the Lancaster office and to other similar offices in cities all over the United States and in Canada. As the loans are collected, the money flows back from the various local branches to the main office. The stream is regular and steady and is continuously paralleled by reports of various kinds, which are for the purpose of keeping the company informed of its business throughout the country and which are necessary if it is to maintain control of it. The money loaned is not the money of the branch offices. The credit extended is credit extended, not by the branch offices but by the defendant in Chicago, acting through its employees in its branch offices.

Regardless of form and phraseology, the defendant's argument is in substance that its business is separated into distinct territorial compartments which function ·in isolation from each other. The Court in the Underwriters case, supra, said that that was not true of the insurance business, and it is not true of this defendant's business. Although there is very little [1] direct inter-

---

1. If a resident of one state, who has borrowed money from one of Household's offices located in that state, moves into another state, the loan is transferred from where it originated to an office in the state into which the borrower has moved. A very small, but not entirely negligible, portion of the business of the Lancaster office consists of such transferred loans. For example, in 1949 it took over from several out-of-state offices, 40 loans amounting to $6,951.10 and transferred to out-of-state offices 25 loans in the amount of $4,370. The total amount of these accounts was slightly over 1% of the total loans made by the Lancaster office in that year. These transfers are as much a part of the defendant's business as the direct loans, and the practice of making them is for the benefit of the defendant as well as the borrower. To eliminate it would obviously injure the defendant's competitive position. I think it fair to say that they are a necessary part of the defendant's business, as that term is ordinarily

relation between one branch office and another, the entire business is integrated and is conducted across state lines.

In U. S. v. South-Eastern Underwriters Ass'n, supra, 322 U.S. at pages 553, 547, 54 S.Ct. at pages 1173, 1170, 88 L.Ed. 1440, the Court laid down the broad principle "No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause", and "a nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature."

■ If the employer's business is interstate in character, then, as has been said, those employees whose activities are essential to its operation are also so engaged. It seems unnecessary to go, in detail, into the activities of each of the employees here involved. Of course, no single employee in the Lancaster office is vitally necessary to the continuance of Household's business, and the Lancaster office could probably continue to function if the force were reduced by eliminating some, but the test is whether the type of work which an employee performs is so intimately related to the defendant's interstate business as to be in practice and legal contemplation a part of it. I think that that is true of all the employees involved in this case.

(2)

■ The Fair Labor Standards Act of 1938 exempted from the coverage of the Act:

"* * * any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce * * *."

The 1949 amendment to this section exempted:

"* * * any employee employed by any retail or service establishment,

more than 50 per centum of which establishment's * * * sales of goods or services is made within the State * * *."

The amendment further provided:

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose * * * sales of goods or services * * * is not for resale and is recognized as retail sales or services in the particular industry * * *."

It is not disputed that more than 50% of the loans made by the defendant's Lancaster office are made within Pennsylvania, and the plaintiff agrees that none of them involve anything which could be called "resale" by the borrowers. Whether these employees are outside the coverage of the Act, therefore, depends entirely upon whether the Lancaster office is a "retail or service" establishment within the meaning of the statute as amended.

The defendant introduced testimony of bankers and others as to how personal loans and the smaller credit transactions of banks and other institutions are regarded in the financial industry, of which industry it may be assumed that small loan companies are a segment. Undoubtedly, it has been common over a period of years for bankers to speak of these transactions as the retail end of the business, and they are no doubt accustomed to using similar expressions in referring to the operations of small loan companies. Whether this testimony establishes the kind of recognition in the industry which Congress had in mind is doubtful. It does not appear that it serves any special purpose to classify persons engaged in banking or finance as wholesalers or retailers, nor that calling the smaller transactions retail is anything more than an analogy borrowed from the mercantile field, in which field the classification has a practical value, because of differences in customary treatment of wholesale and retail sales of

---

used in modern business practice. Congress, in enacting the Fair Labor Standards Act "has made no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer."

United States v. Darby, 312 U.S. 100, 123, 61 S.Ct. 451, 461, 85 L.Ed. 609. See also, Schmidt v. Peoples Telephone Union of Maryville, Mo., 8 Cir., 138 F. 2d 13, and Walling v. Connecticut Co., D. C., 62 F.Supp. 733.

commodities. What the testimony amounts to is that bankers generally speak of small loan transactions as retail and probably think of them as such, very much in the same way that, as one of the defendant's witnesses testified, "the fellows around the bank" (the Bankers Trust Company of New York) call the bank's installment loan department "the bargain basement".

The defendant's witnesses also testified that they considered lending money to be a service and concerns engaged in making loans to be service establishments. "Service" is another overworked word. It has advertising and public relations value and business establishments frequently describe themselves as "serving" the public when they are engaged in selling or manufacturing. Thus, the clerk behind the counter may say to the customer "May I serve you?" when he means "May I sell you something?". Used in a very broad generic sense, the word "services" could apply to almost any economic endeavor and in that sense everybody who receives a payment for doing anything, including the transfer of property by sale, could be described as performing some kind of service. Incidentally, one of the difficulties involved in taking what an industry thinks or says about itself as the final and decisive factor in determining what constitutes a retail service establishment within the meaning of the Act is thus apparent. I suppose that it would not be too difficult for any trade association to adopt a deliberate policy of calling its business a "service" business, a policy which, if persisted in long enough, could ripen into such recognition in the industry as would support plenty of testimony very much like that the defendant here has produced.

On the whole, and with the qualifications stated, I think that the defendant is entitled to a finding that small loan companies are regarded in the financial industry as retail service establishments, although, as will be seen, it is not the determining factor in resolving the issue at hand.

Recognition in the industry, as a test, appears in the statutes for the first time in the 1949 amendment. What the amendment was intended to accomplish is clear, in the light of what had happened to the exemption in the courts. Several decisions, notably Roland Co. v. Walling, 326 U.S. 657, 66 S. Ct. 413, 90 L.Ed. 383 (January 28, 1946) and Northwestern-Hanna Fuel Co. v. McComb, 8 Cir., 166 F.2d 932 (March 10, 1948), had set up the purpose or intention of the purchaser to use the thing in his business as a test of whether sales (of either goods or services) were wholesale or retail. In the coal company case, for example, the Court refused to follow the well recognized understanding of the industry that sales in less than carload lots were retail sales. Senator Holland, in charge of the Bill in the Senate, pointed out that, under the rule laid down by the courts and followed by the Administrator, if a dealer in a small town sold half a dozen towels to a housewife, it would be retail; but, if he sold the same quantity at the same price to a hotel, it would be wholesale. S. pp. 12718 ff. Senator Holland further said, "It seems to us that it is completely fanciful to attempt to distinguish between retail sales and nonretail sales on the simple basis of what will be the use to which the commodity purchased will be put. I think that is a completely false standard and criterion." S. pp. 12727 ff. The statement of the House Managers says: "This clarification is needed in order to obviate the sweeping ruling of the Administrator and the Courts that no sale of goods or services for business use is retail." Undoubtedly, Congress intended that recognition in the industry should supersede or eliminate the intended use of the goods by the purchaser as one of the criteria for determining whether the transactions involved were wholesale or retail.

It is equally clear that Congress, in enacting the amendment, had no intention of making recognition in the industry the sole criterion for determining the scope of the exemption and the coverage of the Act. It was not intended to hand over to any industry the right to judge whether it or any one of its branches was exempt as a retail service establishment. In the course of the debate Senator Holland was asked:

"Then we have the Senator's assurance that this wording is clearly not in-

tended to permit any industry to determine for itself what are generally recognized as retail sales?"

and answered:

"No. We discussed that matter earlier in the afternoon. There could be various criteria which could be applied, one of which of course would be the conclusion of the trade association in the particular industry. But that is only one criterion. Others would apply (95 Cong.Rec. 12510)."

I do not understand the defendant to argue that the amendment made any change in the law beyond abolishing the "consumer-use" test which the courts had applied. As to industry-recognition, the defendant's position is that it had always been the test and that the intent of the 1949 amendment was merely to clarify and confirm the 1938 Act in that respect, that where present it is a determinative factor and that, if the transactions of a business are recognized in the industry as retail sales or services, that business is and always has been thereby within the exemption. On the other hand, the government's view is that if an establishment is performing services which are susceptible of classification as "retail services" then, under the amendment, the judgment of the industry is to be accepted as to whether they are retail or wholesale. If not, there is no occasion to apply the industry-recognition test. I think that the legislative history of the amendment as well as the terms of the original Act, clearly supports the government's view.

In the committee reports and throughout the debates, members of both the House and Senate were repeatedly assured that the amendment would not expand the classes of exempt establishments under the existing law. In enacting the amendment Congress recognized that there were certain industries to which the concept of retailing (or, for that matter, of wholesaling) was totally inapplicable, that such industries were outside the scope of the exemption of the original Act and were not to be affected in any way by the amendment.

The House Managers' Report which is attached to the Conference Report states:

"The Amendment does not include banks, insurance companies, building and loan associations, credit companies, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc., because there is no concept of retail selling or servicing in these industries * * *."

The Senate Report stated:

"The Conference agreement exempts establishments which are traditionally regarded as retail * * * and establishments which do not now have the exemption because the selling or servicing in which they are engaged is not considered to be retail (such as banks, insurance companies, credit companies, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc.) will not become retail or service establishments under the provisions of the Conference agreement."

Senator Holland, on the floor of the Senate answered certain specific questions among which was the following:

"Question. Would the proposed amendment have the effect of exempting banks, insurance companies, credit companies, newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc?

"Answer. No. These types of businesses are not considered exempt under the retail or service establishment exemption in the present law because the selling and servicing which they do are not generally considered to be retail. The proposed amendment would do nothing to change their nonexempt status under the retail and service establishment exemption. To the extent that Congress intended to exempt any of these businesses it created special exemptions for them. See, for example, Section 13(a)(8) (exemption for small weekly and semi-weekly newspapers); Section 13(a)(9) (exemption for local trolleys and local motor bus carriers); Section 13(a)(11) (exemption for switchboard operators of small telephone exchanges)."

Although banks are in the personal loan business and in many that phase of the business predominates, these reports, after receiving which the Congress acted, specifically point out that banks are not in the exempt class.

The fact is that there are certain types of transactions which simply cannot be fitted into the category of performing services at retail and any attempt to do so creates an anomaly. Expert witnesses called by the defendant testified that every form of economic transaction resulting in gain to either party must necessarily be a sale or the performance of a service and, undoubtedly, for statistical purposes and economic studies, it has been found convenient to adopt that concept. However, whatever may be the views of statisticians or economists, the Supreme Court plainly thinks otherwise. In Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638, the Court had before it the case of a company whose business was renting lofts in a building owned by it to various small industries. The Court disposed of the petitioner's contention that inasmuch as it was not selling goods it had to be a "service" establishment within the exemptions of 13(a)(2), with the brief observation, "Selling space in a loft building is not the equivalent of selling services to consumers * * *." Of course, it was not selling goods, and the Supreme Court clearly had no difficulty in conceiving of a business which, so far as the interpretation of the law was concerned, was selling neither goods nor services.

Even though it could be assumed that, as the defendant contends, every business is engaged in selling either goods or services, it does not follow that all sales of services are of the type contemplated by the exemptions. Loaning money (if Congress considered it the sale of a service at all) was clearly not, in the intendment of Congress, a type of transaction which would lend itself to classification as a retail sale of services.

Judgment for the plaintiff. Injunction as prayed for may issue.